IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

ROCKY EUGENE DODD,                    )
                                      )
      Petitioner,                     )
                                      )
vs.                                   )     Case No. CIV-06-140-D
                                      )
RANDALL G. WORKMAN, Warden,           )
      Oklahoma State Penitentiary,    )
                                      )
      Respondent.                     )

## MEMORANDUM OPINION

Petitioner, a state prisoner currently facing execution of two sentences of death, appears with counsel and petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his convictions in the District Court of Oklahoma County, Case No. CF-94-7724, of two counts of first-degree murder. Respondent has responded to Petitioner's *Petition for a Writ of Habeas Corpus* (hereinafter "Petition".)[1] Petitioner has replied to this Response. The State court record has been supplied.[2]

## PROCEDURAL HISTORY

Petitioner was convicted by jury in the District Court of Oklahoma County, State of Oklahoma, Case No. CF-94-7724, of the crime of First Degree Murder for each of the deaths

---

[1] References to the parties' pleadings shall be as follows: Petitioner's *Petition for a Writ of Habeas Corpus* shall be cited as (Pet. at __.); Respondent's *Response to Petition for Writ of Habeas Corpus* shall be cited as (Resp. at __.); and, Petitioner's *Reply* shall be cited as (Reply at __.).

[2] The trial court's original record shall be cited as (O.R. at __.). The trial transcript shall be cited as (Tr., Vol. ___, p. __.).

of Shane McInturff and Keri Sloniker.[3]  The jury recommended the imposition of two death sentences, finding the existence of two aggravating circumstances as to both murders: (1) that Petitioner had previously been convicted of a felony involving the use or threat of violence to the person; and (2) that Petitioner knowingly created a great risk of death to more than one person.

Petitioner appealed his convictions and his death sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA").  The OCCA affirmed Petitioner's convictions and sentences of death in a published opinion dated October 21, 2004. Dodd v. State, 100 P.3d 1017 (Okla. Crim. App. 2004).  Petitioner's subsequent petition for writ of certiorari to the United States Supreme Court was denied on October 3, 2005.  Dodd v. Oklahoma, 546 U.S. 835 (2005).  Petitioner filed an Application for Post-Conviction Relief which was denied by the OCCA in an unpublished opinion dated May 2, 2005. (Case No. PCD-2002-625.) Petitioner's Second Application for Post-Conviction Relief was denied by the OCCA in an unpublished opinion dated April 3, 2008. (Case No. PCD-2006-1065.)

## FACTUAL BACKGROUND

Under 28 U.S.C. § 2254(e), when a federal district court addresses "an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).  For the purposes of consideration of the present Petition, the Court

---

[3]  This was Petitioner's second trial on these charges.  His previous murder convictions and death sentences resulting from his first trial were reversed by the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). Dodd v. State, 993 P.2d 778 (Okla. Crim. App. 2000).

provides and relies upon the following synopsis from the OCCA's opinion summarizing the

evidence presented at Petitioner's trial. Following review of the record, trial transcripts, and

the admitted exhibits, the Court finds this summary by the OCCA is adequate and accurate.

The Court therefore adopts the following extensive and thorough summary of the facts as its

own:

> On the afternoon of Monday, November 7, 1994, the bodies of Shane McInturff and his fiancé, Keri Sloniker, were found lying side by side, face-down in a pool of blood, in the bedroom of their Edmond apartment. Appellant lived in an apartment immediately next door to the victims with his wife, Shelly Dodd, and their infant daughter. Appellant and Shane McInturff were also co-workers at a local business. The bodies were found by Shane's father, Robert McInturff, after Appellant reported that Shane had not shown up for work that day. Appellant accompanied Robert McInturff as he gained entry into the apartment. Upon seeing the bodies, Robert McInturff called for help; emergency personnel and police arrived within minutes.

> Detectives began processing the scene and interviewing witnesses. McInturff and Sloniker had not been seen by anyone since the early morning hours of Sunday, November 6, 1994. They had spent much of Saturday in the company of two friends, Brian Brown and Lisa Way. Brown testified that while at the victims' apartment on Saturday afternoon, he saw Appellant come over and hand McInturff a check for $70.00. McInturff later showed Brown another $70.00 check that Appellant had given him earlier in the day. Brown stated that the checks were payments for methamphetamine that McInturff had supplied to Appellant.

> Later that evening, Brown, Lisa Way, and the two victims went to a local pool hall after smoking marijuana and methamphetamine at the victims' apartment. Lisa Way testified that the victims kept a stash of drugs in a box under their living room couch, and that the box was under the couch when the foursome left to play pool. They arrived at the pool hall at approximately 10:30 p.m. and left at approximately 1:30 a.m. Brown dropped off the rest of the group at the victims' apartment and went home; the victims invited Way to come up and watch a movie and spend the night at their apartment, and Way accepted. Upon entering the apartment, McInturff asked Keri to roll a joint. According to Way's testimony, when Keri pulled the box from under the

couch, she saw that the cache of drugs was missing. McInturff became extremely angry and loud, kicking the common wall between his and the Dodds' apartment, and loudly accusing Appellant of stealing the drugs. McInturff then went next door to Appellant's apartment, where a heated exchange took place. Soon after McInturff returned to his apartment, Appellant followed and told McInturff to keep the noise down because his child was trying to sleep.

Part of the confrontation between Appellant and McInturff was also witnessed by Dennis Kersh, who lived in an apartment across the breezeway of the small complex. At approximately 2:00 a.m. Sunday morning, Kersh was awakened by a loud noise outside. He then heard someone yell "fuck" from the direction of the victims' apartment. From his window, Kersh saw Appellant run over to the victims' apartment. According to Kersh, as Appellant entered the apartment he yelled, "what the fuck is going on."

According to Lisa Way, after Appellant left the apartment, the victims began discussing a plan to cash the two checks Appellant had given McInturff earlier that day, and tell Appellant's wife that he was still using drugs. They believed this would cause problems for Appellant, because Appellant's wife (who happened to be out of town at the time) had threatened to leave Appellant if she ever found out he was using drugs again. Way decided not to stay the night after all, and left the victims' apartment at about 3:00 a.m. on Sunday. This was the last time anyone saw Shane McInturff and Keri Sloniker alive. Later that Sunday, Brown found McInturff's paycheck in his car. At approximately 5:00 p.m., Brown went by the victims' apartment to return the paycheck, but no one answered when he knocked on the door. Appellant, who was sitting outside his apartment, told Brown he had not seen Shane or Keri that day.

Appellant told police that on the morning of Monday, November 7th, he went by the victims' apartment to give McInturff a ride to work. No one responded to his knocks, and McInturff did not report to work that day. Because the victims did not have a telephone, Appellant left several messages throughout the day on the answering machine of Shane McInturff's parents, expressing concern about Shane and Keri's whereabouts. Appellant was off work and at the apartment complex later that afternoon when Robert McInturff arrived to check on his son. The front door was locked, and Mr. McInturff first tried to enter the apartment through a front window, which the victims were known to routinely leave unlocked; however, the window was locked as well, so he obtained a key to the apartment from the landlord.

Upon entering the apartment, Mr. McInturff observed two bodies face-down on the bedroom floor. Mr. McInturff testified that he did not turn on the bedroom light and that Appellant remained near the front door. McInturff yelled for Appellant to call 911. Because of the location and position of the bodies, Mr. McInturff stated that he was unable to determine the manner in which Shane and Keri were killed. He noticed that Shane's wallet was lying open in the living room.

The earliest that any of the emergency personnel or police were able to tell the manner in which the victims had been killed was approximately 9:25 p.m. Monday evening, several hours after the discovery, when the bodies were moved for the first time by the medical examiner, who determined that the victims had their throats cut with a very sharp bladed instrument. Before that, the assumption had been that the victims were shot in the head. Appellant was being questioned at the police station at the time the true cause of death was revealed. In a key piece of evidence, Appellant spoke with Dale Ketler, his supervisor at work, at 6:41 p.m. on Monday evening - a half-hour after the bodies had been found - and informed him that Shane and Keri had been murdered and that their throats had been cut. In another key piece of evidence, at work earlier that day, Appellant returned a large, fixed-blade hunting knife that he had borrowed from a co-worker, Al Ames. He left the knife at Ames' workstation, with a note of thanks for getting to borrow the knife and adding that he never had a chance to use it. When news of the murders spread around the workplace on Tuesday, Ames turned the knife and the note over to police.

Investigation of the crime scene revealed trace evidence that someone may have washed blood down the victims' bathroom sink. A missing hand towel from that bathroom was found in the apartment complex dumpster, stained with blood. DNA analysis could not exclude either victim as the source of that blood. Except for the fact that Keri's purse had been dumped out, the victims' apartment was intact, with nothing of known value taken; Keri's engagement ring was still on her finger. No sign of a weapon was found, and although the victims were positioned as if they might have been bound by the wrists, no ligatures or ligature marks were discovered. No traces of blood were found on the knife Appellant had borrowed from Al Ames. There was no sign of a struggle with the victims or any defensive wounds on their bodies. There was no sign of forced entry, and Robert McInturff had found the front door to the apartment locked. Police found the front window to the apartment unlocked, even though Robert McInturff stated that he had unsuccessfully tried to open that window when he, accompanied by Appellant, first tried to gain access to the apartment late Monday afternoon.

Appellant, Brown, and Way were all questioned by police the night the bodies were discovered. When questioned about the two $70.00 checks that Brown had seen in McInturff's possession, Appellant first claimed he had loaned McInturff money to buy a car from McInturff's uncle, and that McInturff actually returned the checks later Saturday afternoon because the uncle was selling the car to someone else. Appellant claimed that he tore the checks into several pieces and tossed them in the trash. Appellant was apparently unaware that Lisa Way had returned to the victims' apartment early Sunday morning after playing pool, and had seen the two checks at that time. He was also unaware that before she was murdered, Keri Sloniker had entered the two checks into her check register and filled out a deposit slip for them. A search of the apartment complex dumpster revealed trash from Appellant's apartment, but no evidence of the checks. Robert McInturff cast further doubt on Appellant's initial claim when he testified that he had made arrangements to loan Shane money to buy a car from his brother in Arkansas.

At trial, Appellant testified on his own behalf and modified his version of events. First, he admitted that the two $70.00 checks he had written to McInturff were payment for methamphetamine, and not a car loan as he initially claimed. He claimed that when McInturff's father opened the apartment late Monday afternoon, he (Appellant) saw the checks by McInturff's wallet and took them then. To explain the fact that no evidence of the checks had been found in the dumpster, Appellant again altered his version of events, claiming that he had run back to his own apartment, nauseated upon finding his friends were dead and, while vomiting in the toilet, tore up the checks and tossed them in as well.

At trial, Appellant admitted that he had borrowed a hunting knife from his co-worker, Al Ames, a few weeks before the murders, and returned it the day the bodies were discovered. However, Appellant claimed he did not have access to the knife at the time of the murders, because his wife had traveled out of town for the weekend, and he had placed the knife in the trunk of their car on Friday before she left. In rebuttal, Appellant's wife, Shelly Dodd, testified she was in and out of the car trunk several times that weekend, and that she did not recall seeing Ames's knife therein.

Appellant also offered a new explanation at trial for why he told Dale Ketler that the victims had their throats cut, even though the cause of death was not determined until several hours later. Appellant originally told police that he just assumed a knife had been used because of all the blood surrounding the bodies. At trial, however, Appellant claimed for the first time

that he had observed the emergency responders talking with each other at the scene, and saw one of them make a gesture across his throat with his thumb. In rebuttal, the State presented the testimony of the first responding emergency personnel. None of them recalled making any such gesture, and all testified that such a gesture would be highly unprofessional conduct at a homicide scene. One of the first emergency responders also testified that when he first came on the scene and spoke with Appellant, Appellant claimed that he had been playing pool with the victims the previous Saturday night.

During a search of the Dodds' apartment on Monday evening, police seized a number of items, including a pair of wet blue jeans and a copy of the "Anarchist Cookbook," which Brian Brown had lent to Appellant and which describes, among other things, how to kill a person efficiently with a knife by cutting their throat. In his testimony, Appellant could give no explanation for the wet jeans. Martin Mullins, Appellant's father-in-law, testified that Appellant had done laundry at his home on the afternoon of Saturday, November 5; the Dodds' apartment did not have a washer or dryer. Mullins did not recall Appellant returning to his apartment with any wet clothing that afternoon, which was two full days before the wet jeans were seized. Shelly Dodd testified that she did not hand-wash any jeans after she returned from her weekend trip on Sunday evening.

According to Mullins, while Appellant's laundry was washing and drying, on Saturday afternoon, Appellant spent his time shooting a crossbow pistol in Mullins' backyard and sharpening several hunting knives that Appellant had brought over with him. Mullins recalled that Appellant had brought a folding-blade knife and a fixed-blade knife to his home for sharpening. The knife Appellant had borrowed from Ames was a fixed-blade knife, and detectives found it to be very sharp when they obtained it. According to police, the only fixed-blade knife found in Appellant's apartment had a dull blade, suggesting that he did not, in fact, sharpen that knife at Mullins' home on the Saturday before the murders. At trial, Appellant claimed he only sharpened two folding-blade knives at Mullins' home.

Mullins also testified that after Appellant was arrested and charged with the murders, he helped his daughter move out of the apartment. While packing, Mullins said, he found several magazines devoted to photos and articles about how to kill people, including one that, according to Mullins, had a cover story about "How to cut your target's throat and leave no evidence." Shelly Dodd's cousin, Malinda Anderson, testified that she had seen similar magazines in the Dodds' bedroom in mid-1993, when she and her husband

spent the night there.

       As noted, Appellant testified on his own behalf at trial, and denied any participation in the murders. He also presented expert testimony suggesting that it would have been unlikely that one person could have subdued two victims without having to restrain either of them with some sort of binding.

Dodd, 100 P.3d at 1024-27.

       Additional facts and testimony were submitted to the jury at trial not contained herein or in the OCCA's summary. Additional facts necessary for a determination of Petitioner's claims will be set forth in detail throughout this Opinion where applicable.

## PETITIONER'S CLAIMS FOR RELIEF

### STANDARD OF REVIEW

       Under the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order to obtain federal habeas relief once a State court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

       (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
       (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d)(1-2).

       The Supreme Court defined "contrary to" as a State court decision that is "substantially different from the relevant precedent of this Court." Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A decision can be "contrary to" Supreme Court precedent "if the state court applies a rule that

contradicts the governing law set forth in [Supreme Court] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Id. at 405. The "unreasonable application" prong comes into play when "the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

The "AEDPA's purpose [is] to further the principles of comity, finality and federalism. There is no doubt Congress intended AEDPA to advance these doctrines." Williams v. Taylor, 529 U.S. 420, 436 (2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrison v. Richter, ___ U.S. ___, 131 S.Ct. 770, 786 (2011)(citation omitted).

GROUNDS FOR RELIEF

Ground 1:     Sufficiency of the Evidence.

In his first ground for relief, Petitioner claims the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he killed Shane McInturff and Keri

Sloniker. He asserts that prosecutorial overreaching, preclusion from presenting his own circumstantial evidence as a result of the State's "overt act" rule, judicial bias, ineffective assistance of counsel, and "myriad" other errors, compromised "the first line of defense against an erroneous conviction," i.e., the jury, and as such this Court should apply the OCCA's "reasonable hypothesis" test for sufficiency of the evidence review of convictions based solely on circumstantial evidence. (Pet. at 12-23.)[4]

In a federal habeas proceeding, the appropriate inquiry into a sufficiency-of-the-evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

> This standard reflects the "longstanding principle that it is the jury's province to weigh the evidence and to draw reasonable inferences from testimony presented at trial." Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir. 2004). Our review under this standard is "'sharply limited' and a court 'faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir.1996) (quoting Wright v. West, 505 U.S. 277, 296-97, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).

Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006).

---

[4] It is not the role of a federal court performing collateral review to ensure the State court correctly applied its own law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas relief does not lie for errors of state law."). Instead, it is this Court's role to enforce federal law and not the standard Petitioner proposes. Matthews v. Workman, 577 F.3d 1175, 1183 n.3 (10th Cir. 2009).

The Court's inquiry is based upon the entire record, and the reasoning process actually used by the trier of fact, whether known or not, is not considered. <u>Jackson</u>, at 319 n.13 ("The question of whether the evidence is constitutionally sufficient is of course wholly unrelated to the question of how rationally the verdict was actually reached.").

The AEDPA additionally directs that, where the State court has already addressed the claim, this Court's review is further limited. <u>See</u> <u>Valdez v. Ward</u>, 219 F.3d 1222, 1237 (10th Cir. 2000). In that instance, the Court's review is governed by 28 U.S.C. § 2254(d).

> Sufficiency of the evidence is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas. <u>See</u> <u>Hamilton v. Mullin</u>, 436 F.3d 1181, 1194 (10th Cir.2006); <u>see also</u> <u>Hale v. Gibson</u>, 227 F.3d 1298, 1335 n. 17 (10th Cir.2000) (noting precedent has investigated sufficiency of the evidence both as a legal question and as a factual question). We are required to defer to any determination of factual issue by the state court due to the presumption of correctness afforded by § 2254(e). <u>Fields v. Gibson</u>, 277 F.3d 1203, 1221 (10th Cir.2002).

<u>Maynard v. Boone</u>, 468 F.3d 665, 673 (10th Cir. 2006). The presumption of correctness can only be overcome by "clear and convincing" evidence. <u>Bryan v. Gibson</u>, 276 F.3d 1163 (10th Cir. 2001).

Petitioner argues he did not kill Shane McInturff and Keri Sloniker. Specifically, he challenges the circumstantial evidence case underlying his convictions. On appeal, the OCCA first noted that the law makes no distinction between direct and circumstantial evidence, and that regardless of what type of evidence or combination, there is only one standard by which each element of an offense must be proven – proof beyond a reasonable

doubt. <u>Dodd</u>, 100 P.3d at 1041 (citing <u>In re Winship</u>, 397 U.S. 358, 364 (1970)). The OCCA

noted that the jury was presented with an interconnected web of physical evidence, eye-

witness testimony, and inconsistent statements by Petitioner:

> The State presented testimony that Appellant was one of the last people to have seen the victims alive, and that he was involved in an altercation with them at that time; that he had both motive and opportunity to commit the crimes; that he had a collection of weaponry, particularly knives, an interest in methods of killing, and access to one knife in particular that was consistent with the attributes of whatever weapon was used – a knife which Appellant just happened to return to its owner the day after the murders.

> A pair of wet blue jeans was found in Appellant's apartment a day or so after the murders. When he testified, Appellant had no explanation for why the jeans were wet. Appellant's wife had been out of town the weekend of the murders, and she testified that she did not wash them. Moreover, it would have been unlikely that the jeans would have remained wet from the Friday that she left until the Monday evening when they were seized.

> Many of Appellant's original statements to police were made before he realized that physical and eyewitness evidence would work together to contradict him. Appellant then changed his version of events to try to accommodate these new facts, such as why he had written checks to McInturff, when and how he got the checks back, and what he did to dispose of them.

> When Appellant testified at trial, he offered entirely new explanations for some very damaging pieces of circumstantial evidence, such as his advance knowledge of how the victims were murdered, and his access to Al Ames's hunting knife. These new explanations were themselves impeached by testimony presented in the State's rebuttal.

<u>Dodd</u>, 100 P.3d at 1042.

After a detailed review of the evidence presented by both the State and the defense,

the OCCA denied Petitioner's claim and held: "Reviewing the evidence as a whole, including

evidence presented by the defense, we believe a rational juror could have determined that

Appellant's guilt was the only reasonable hypothesis presented, and further, that that hypothesis was proven beyond a reasonable doubt." Id. at 1042-43 (citation omitted).

Petitioner argues that several conflicting inferences from the circumstantial evidence presented at trial supports his claim that the evidence was insufficient for his convictions.[5] While repeating that his case was based on circumstantial evidence, Petitioner asserts that "cobbling the pieces together" does not establish guilt beyond a reasonable doubt. (Pet. at 17.) As this Court must, however, any conflicting inferences from the evidence are resolved in favor of the prosecution. Most of the alleged conflicts arise from Petitioner's own testimony and attempted explanations – testimony presented to and considered by the jury. As detailed by the OCCA, the evidence presented, although circumstantial, demonstrates that Petitioner had the opportunity, means, and motive to carry out the murders.

After a thorough review of the trial record, and considered in the light most favorable to the State, see Jackson, 443 U.S. at 319, the Court finds that the evidence presented at trial was sufficient for a rational trier of fact to find the existence of all of the elements of the charged offenses beyond a reasonable doubt. Petitioner has failed to demonstrate that the OCCA's determination was contrary to, or an unreasonable application of, the Jackson "rational factfinder" standard, nor has Petitioner demonstrated the OCCA's determination resulted in a decision that was based on an unreasonable determination of the facts in light

---

[5] "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

of the evidence presented in his trial.[6]  Accordingly, Petitioner's first ground for relief is denied.

Ground 2:     <u>Presentation of a Defense</u>.

In his second ground for relief, Petitioner claims Oklahoma's "overt act" standard for presentation of evidence of other perpetrators impermissibly shifted the burden of proof and raised it to an unconstitutional level, permitting the prosecution to present circumstantial evidence while denying Petitioner the opportunity to present evidence to create a reasonable doubt.  Petitioner claims this resulted in convictions and unreliable death sentences in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  Respondent responds that Oklahoma's disallowance of Petitioner's third-party perpetrator evidence was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Prior to and during trial, Petitioner sought to introduce testimony pertaining to Shane McInturff's previous encounter with a woman named Gidgett Long and her Asian friends regarding his payment of a debt.  Months prior to the murders, Shane was allegedly threatened by Ms. Long regarding what would happen if he did not pay off the debt.  In satisfaction of that debt, Shane gave her his pool cue and signed over the title of his car.  This incident and the paying of the debt occurred approximately six months prior to the murders.

---

[6]  "[Oklahoma's reasonable hypothesis] standard is actually more onerous than <u>Jackson</u>. Thus, if the evidence was sufficient to meet Oklahoma's stricter test, it would certainly also meet the <u>Jackson</u> standard. <u>Romano v. Gibson</u>, 239 F.3d 1156, 1164 (10th Cir. 2001).

(Motion Hearing, 1/10/02, p. 34.)    Additionally, Petitioner further sought to introduce evidence regarding Shane's drug dealing and a possible outstanding drug debt owed to an individual in Arkansas.  Petitioner claims that this proffered testimony was necessary to cast doubt on the State's theory of the case by demonstrating Shane's fear of an Asian gang and that a possible previously botched drug deal and resulting debt might indicate someone other than Petitioner could have committed the murders.

The trial court denied Petitioner's motions, stating that motive alone is insufficient and that Petitioner had not demonstrated an overt act on the part of a third person through his arguments of Shane's lifestyle and Shane's possession of a tire iron and a knife in his apartment. (Motion Hearing, 1/10/02, p. 54.)  On appeal, the OCCA thoroughly reviewed Petitioner's argument and determined it was not an abuse of discretion by the trial court to exclude the evidence as irrelevant and that he was not prevented from presenting a defense:

> Questions concerning the relevancy of particular evidence are within the discretion of the trial court, and its resolution of those issues will not be disturbed absent a clear showing of abuse, accompanied by prejudice to the accused. <u>Dennis v. State</u>, 1994 OK CR 34, ¶ 15, 879 P.2d 1227, 1232. Regarding evidence of alternative suspects, we have held:
>
>> [E]vidence offered to show that some other person committed the crime charged must connect such other person with the fact; that is some overt act on the part of another towards the commission of the crime itself.  There must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused. . . .  [It is] not enough to show a possible motive on the part of another; the evidence must show an overt act by the third person toward the commission of a crime.
>
> <u>Woodruff v. State</u>, 1993 OK CR 7, ¶ 47, 846 P.2d 1124, 1137, <u>cert. denied</u>, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

The evidence proffered by the defense not only failed to establish an overt act by a third party, but more fundamentally, it failed to establish an identifiable third party with a motive to harm either McInturff or Sloniker. The defense proffered several pieces of evidence, but the more specific one item was, the more likely it was inconsistent with others. In addition, the State made its own proffer, and from the representations of the prosecutor at the pretrial motion hearing (which were not contested by the defense), it appears that investigation along these alternative lines actually dispelled most of the suspicions raised by the defense's proffer. Taken as a whole, the proffered evidence suggested only that Shane McInturff's drug use and gambling could have caused him to be on bad terms with any number of people. Because the evidence did not point in any particular direction or to any particular person, it amounted only to evidence of the victim's bad character, and as such, was inadmissible in the guilt stage of trial. See Conover v. State, 1997 OK CR 6, ¶¶ 25-27, 933 P.2d 904, 912. Because the proffered evidence was ambiguous and entirely speculative as to a potential alternative suspect, the trial court did not abuse its discretion in excluding it from the guilt stage of trial to avoid confusion of the issues. 12 O.S.2001, §§ 2401-03; Romano v. State, 1993 OK CR 8, ¶ 45, 847 P.2d 368, 381, aff'd., 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994).

We also reject Appellant's claim that barring this evidence violated his constitutional right to fair trial, because it prevented him from mounting a defense. Appellant has not demonstrated that the general rules of relevancy, codified in our Evidence Code, worked to deny him this right. Appellant was simply barred from presenting what, in the trial court's discretionary determination, did not tend to be probative of any fact in issue. And in fact, Appellant was able to present evidence and argument on many of the subjects he lists as alternative-suspect evidence. For example, the jury was made aware that the victims possessed paraphernalia not only for ingesting drugs, but for distributing them as well. Expert testimony showed that some DNA recovered from the bloody hand towel did not match either victim or Appellant, and that numerous latent fingerprints lifted from the crime scene did not match either the victims or Appellant. In addition, Appellant presented expert testimony as to the unlikelihood that a lone assailant could have held two victims in submission without restraining them in some manner, and testimony was presented that the manner of killing was reminiscent of gang violence. Thus, Appellant was permitted, within the parameters of the Evidence Code, to advance and attempt to support his claim that a reasonable doubt existed that he was the perpetrator.

Nor do we agree with Appellant that any of this proffered evidence became admissible in the punishment stage to counteract impressions left by the victim impact testimony. Some [of] it was simply not relevant to the victims' character. The rest was cumulative, and even if it was admissible in the punishment stage to give additional details of the victims' bad character, any error in its exclusion was harmless beyond a reasonable doubt. Compare Conover, 1997 OK CR 6, ¶¶ 77-80, 933 P.2d at 922-23 (trial court erred in preventing defense from counteracting victim impact evidence of victim's good character with evidence of his drug use). The jury was well aware from the evidence presented in the guilt stage of trial that the victims were involved in purchasing, using, and selling illegal drugs. The victims' secret involvement with drugs was acknowledged by some of the family members testifying as victim impact witnesses. We do not believe the jury's impression of the victims would have been materially altered by additional evidence that McInturff liked to gamble, or by specific instances of his drug purchases. This proposition is denied.

Dodd, 100 P.3d at 1033-34.

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (observing that the right to present a defense may be rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment). That right, however, is not absolute, and States have broad latitude to establish rules excluding evidence from criminal trials. Id. Nonetheless, if a State's rules are arbitrary or disproportionate to the purpose they are designed to serve and infringe upon "a weighty interest of the accused," the rules may violate a criminal defendant's right to present a defense. Id.

In Holmes, the Supreme Court specifically addressed "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime

with which they are charged." <u>Holmes</u>, 547 U.S. at 327. The Court noted that such evidence may be introduced by the accused when "it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded." <u>Id.</u> (citations and quotations omitted). The Court examined the evidentiary standards of the State of South Carolina to determine whether those standards comported with constitutional requirements. It found that the rule applied by the South Carolina Supreme Court was "arbitrary" and did not rationally serve the proper ends of third-party perpetrator evidentiary rules because South Carolina's rule permitted exclusion of the third-party evidence based solely on the strength of the prosecution's evidence against the defendant. Criticizing the State rule, the Supreme Court stated: "If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice or confusion of the issues." <u>Id.</u> at 329. As discussed <u>infra</u>, however, the Oklahoma rule applied in this case does not suffer from the same defect, as the strength of the prosecution's evidence is not a factor in determining the admissibility of evidence of a third-party perpetrator.

Under Oklahoma law, the admissibility of third party perpetrator evidence is governed by the following standards:

"There must be evidence of acts or circumstances that tend clearly to point to another, rather than to the defendant, as the guilty party," . . . "there must be such proof of connection with it, such a train of facts or circumstances, as tend clearly to point out some one besides the prisoner as the guilty party. Remote acts, disconnected, and outside of the crime itself, cannot

18

be separately proved for such a purpose" . . . , and "there must be evidence of acts or circumstances that tend clearly to point to another, rather than the accused." Accordingly, proof of an overt act in the commission of the crime is required, but it is as a threshold showing, and not as the sole determining factor. It is only one of the factors to consider in determining if the evidence sufficiently connects the third party to the crime.

As our test for determining the admissibility of third party perpetrator evidence is based upon more than the single finding of an overt act in the commission of the crime, the standard is not too strict and is consistent with constitutional principles. It does not prevent the defendant from presenting a defense or presenting evidence that another person may have committed the crime as long as there is some quantum of evidence, which is more than mere suspicion and innuendo, that connects the third party to the commission of the crime. It does not directly control the scope of defense counsel's argument to the jury and counsel is allowed to argue any inference that can be fairly drawn from the evidence.

Stouffer v. State, 147 P.3d 245, 261-62 (Okla. Crim. App. 2006)(quoting Gore v. State, 119 P.3d 1268, 1276 (Okla. Crim. App. 2005)).

The Holmes' Court recognized that exclusion of evidence that another may have committed the crime when it is speculative, remote, or does not tend to prove or disprove a material fact in issue is a widely accepted rule among the States, including Oklahoma. Holmes, 547 U.S. at 327, n* (citing Gore, 119 P.3d at 1272-76). Petitioner's proffered evidence does not identify any individual as the alternative perpetrator, and there is no evidence of any overt act by a third-party. The fact that Shane McInturff was previously afraid of some alleged gang members over a gambling debt is insufficient to rise to the level of evidence of an overt act. The incident occurred months before the murders and testimony revealed he paid the debt with a pool cue and his car. Petitioner presented no evidence to demonstrate any on-going contact between Shane and the "Asian gang" or that he harbored

any resulting fear of them.[7]

Because the proffered evidence lacked probative value for showing the involvement of a third-party perpetrator and was inadmissable evidence at trial of the victim's bad character, the trial court, as determined by the OCCA, properly excluded the evidence, and Petitioner was not deprived of a meaningful opportunity to present a defense. Petitioner has failed to demonstrate that the OCCA's determination of this issue was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's second ground for relief is denied.

Ground 3:     Hearsay Evidence and Other Crimes or Bad Act Evidence.

In his third ground for relief, Petitioner claims the erroneous admission of testimony from witness Brian Brown violated his constitutional rights to confrontation, to present a defense, and to a fundamentally fair trial. (Pet. at 39-43.)

At trial, the State called Mr. Brown to testify regarding several events that occurred the day before the murders and the following afternoon. In addition to his testimony about the activities he and the victims participated in together shortly before their deaths, Mr. Brown testified on direct examination regarding two prior conversations with Shane McInturff concerning Petitioner. First, in response to a question on direct about whether Shane had ever described any obscure or weird behavior on the part of Petitioner, Brown

---

[7] Petitioner attaches to his Petition newspaper articles regarding fights at a pool hall between Asian gangs resulting in one person being shot and killed (Attachment 9) to assert Shane was "'scared to death' of a gang who frequented pool halls, like the one where he went on November 5-6, 1984 [sic]." (Pet. at 38.) The articles are dated December 4, 1996 and January 14, 1997 – over two years after the murders occurred. Further, no evidence was presented that Shane was afraid to visit the pool hall with Keri and their friends the night before the murders.

testified Shane once told him of an instance when Shane and Petitioner had gone driving. According to Shane, Petitioner got out of the car and fired several shots at a Ferris Wheel in an amusement park. In a second instance complained of by Petitioner, Brown testified Shane once told him that Petitioner owed Shane $800.00 for drugs.

Both of Brown's statements were objected to by defense counsel on hearsay grounds. As to the testimony regarding the $800.00 debt, the OCCA determined Brown's statement to be non-prejudicial error:

> Brown's testimony that Appellant owed McInturff approximately $800 for drugs was hearsay, and was met with a timely defense objection on those grounds. Brown had no personal knowledge of how much money, if any, Appellant owed McInturff, and the State's explanation for why the statement was admissible necessarily assumed that it was true. Moreover, the statement was made months before the murders, so its relevance as to the amount of money allegedly owed is questionable. However, we cannot say this error prejudiced Appellant, given other evidence, particularly Appellant's own testimony, that he had been buying methamphetamine from McInturff for some time before the murders. Smith v. State, 1985 OK CR 17, ¶ 9, 695 P.2d 864, 867.

Dodd, 100 P.3d at 1034.

Regarding the alleged Ferris Wheel shooting statement, the OCCA also found the admission of that testimony to have been error, but harmless in light of other evidence presented at trial:

> The larger question, however, is the relevance of the ultimate fact that the State claimed it was trying to establish – McInturff's alleged fear of Appellant. Nothing about the State's theory of the case depended on such fear. McInturff continued to fraternize with Appellant and sell him drugs. Indeed, McInturff's anger and confrontation with Appellant over the missing drugs, and his threats to report Appellant's drug use to his wife, were apparently not dampened by any fear on McInturff's part. See Wadley v. State, 1976 OK CR

178, ¶ 10, 553 P.2d 520, 523 ("[W]here hostile emotions at a particular time are to be proved in a case, the existence of the same emotion in the same person at another time is proper evidence")(emphasis added). Even if the alleged Ferris Wheel incident did give McInturff pause, that fact simply was not relevant to the issues in this case. Rather, the obvious point of this evidence was to portray Appellant as generally a bad person with "obscure or weird" behavior, a person with little regard for human life. As such it was improper bad-character evidence, which had no visible connection to the murders, and the trial court should not have admitted it. 12 O.S.2001, §§ 2401-04; Rushing v. State, 1984 OK CR 39, ¶ 44, 676 P.2d 842, 850-51.

Whether there is a reasonable possibility that this evidence affected the outcome of the trial, however, is a separate question. From evidence properly admitted at the guilt stage of trial, the jury was aware that Appellant had a collection of knives and other lethal weaponry, had a borrowed copy of "The Anarchist Cookbook" which described efficient ways of killing people, had his own collection of magazines describing how to kill people (discussed in Proposition 8), and had a violent criminal history beginning at an early age. Unlike the indiscriminate flavor of the alleged Ferris Wheel incident, the murders in this case involved a very personal assault with an identifiable motive. The jury was instructed that evidence of Appellant's other crimes or bad acts was not offered merely to show he acted in conformity therewith. Considering the other character evidence which was properly admitted at trial, we find this error was harmless beyond a reasonable doubt. Welch v. State, 2000 OK CR 8, ¶ 29, 2 P.3d 356, 370.

Id. at 1035-36.

The Confrontation Clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Fourteenth Amendment renders the Clause binding on the States. Pointer v. Texas, 380 U.S. 400, 403 (1965). In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court examined the common-law history of the confrontation right, noting that in England, pretrial examinations of suspects and witnesses by governmental officials "were sometimes read in court in lieu of live testimony." Id. at 43. The Court cited the definition

of "testimony" as "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact," id. at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)), and stated:

> An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Id.

Because Shane was not available to testify at the trial, Petitioner claims the trial court violated his right to confrontation when it allowed Brown, over defense hearsay objections, to relate Shane's statements regarding the alleged Ferris Wheel incident and the $800.00 debt. On direct appeal, the OCCA ruled its admission under this precept was error but the error was harmless in light of other evidence presented at trial.

This Court's review under the AEDPA is limited. Despite the basis for the OCCA's conclusion, it determined the admission of the statements was harmless error. Therefore, habeas review is restricted only to whether the admission of the testimony was harmless under the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Fry v. Pliler, 551 U.S. 112, 121 (2007) (habeas court in § 2254 proceedings is to assess prejudicial impact of constitutional error under the "substantial and injurious effect" standard set forth in Brecht whether or not State court recognized error and despite which harmlessness standard it used). Under Brecht, habeas relief is available on review of constitutional error only if the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht,

507 U.S. at 637 (quoting <u>Kotteakos v. U.S.</u>, 328 U.S. 750, 776 (1946)).

Petitioner maintains the statements were not harmless because it was the "type of bad acts evidence that most risks an arbitrary verdict reached through passion or prejudice rather than strict application of beyond a reasonable doubt standard." (Pet. at 42.) He further contends the OCCA's analysis failed to consider the cumulative impact of hearsay evidence, overruling of defense objections by the trial court, and the trial court's implicit endorsement of the prosecutor's misbehavior. <u>Id.</u>[8]

The OCCA recognized that the alleged drug debt statement was made months before the murders and its relevance was questionable. It found, however, that due to other evidence presented at trial of Petitioner's purchases of drugs from Shane for some time prior to the murders, the erroneous admission of the statement did not prejudice him. As to the statement regarding the alleged shooting toward an amusement ride, testimony and evidence were also received regarding Petitioner's collection of weapons, his apparent fascination with methods of killing people (the Anarchist's Cookbook and various magazines), his history of crime and violence toward others (assault upon an elderly woman, robbery of a paper boy with a knife, and assault on a probation officer), together with his own testimony containing multiple contradictory statements. Considering the evidence and testimony collectively, the Court cannot find that these two statements, found to have been improperly admitted, had a

---

[8] Petitioner further argues in his Reply: "Mr. Dodd does not suggest he should prevail merely because the Court of Criminal Appeals' harmless error analysis was inadequate. Rather, the inadequacy helps to explain the Oklahoma court's erroneous ruling. Further, the ruling was 'contrary to law,' rendering this claim amenable to habeas relief for a reason in addition to the unreasonableness of the state court's assessment of the facts and law." (Reply at 45.)

substantial and injurious effect or influence on the jury's verdict or the sentences of death. Accordingly, Petitioner's third ground for relief is denied.

Ground 4:    Ineffective Assistance of Counsel.

Petitioner raises an array of instances throughout trial he claims constitute ineffective assistance of trial counsel. While some of these claims were raised in some form on appeal and considered by the OCCA, most involve claims first raised in Petitioner's second application for post-conviction relief and barred from review by the OCCA, namely: (1) failure to pursue all aspects of the defense theory that someone else committed the crime, including information of "foreign voices" allegedly heard near the apartment around the time of the crime (Pet. at 48); (2) failure to adequately challenge the State's forensic case by arguing the inability to detect blood on the alleged murder weapon (Pet. at 49); (3) failure to adequately develop evidence that methamphetamine was in the victims' apartment and used by the victims to undercut the State's "frozen in fear" argument (Reply at 50)[9]; (4) failure to advise Petitioner not to testify and/or failing to adequately prepare him to testify (Pet. at 57); (5) failure to investigate and present testimony of the arresting officer on Petitioner's juvenile offense (Pet. at 59); and, (6) failure to present mitigation evidence and allowing the prosecutor to argue Petitioner had a normal childhood (Pet. at 61).

*Procedurally Barred Claims*

Previously, the Court granted Petitioner's *Renewed Motion to Hold Case in Abeyance*,

---

[9] This claim has never been raised in State court and was first presented in Petitioner's Reply brief. As such, it is unexhausted and procedurally barred from habeas review.

permitting exhaustion of multiple claims in State court. (Dkt. No. 46.)  Petitioner had just previously filed a *Second Application for Post Conviction Relief* in State court, raising five propositions of error containing claims he acknowledged were unexhausted.  In reference to the claims of ineffective assistance of counsel, the OCCA held that it had reviewed each sub-claim and "because none of them are based on newly-discovered facts or new controlling legal authority, they are barred.  Rule 9.7(G)(1), Rules of the Oklahoma Court of Criminal Appeals." <u>Dodd v. State</u>,  No. PCD-2006-1065, slip op. at 3 (Okla. Crim. App. Apr. 3, 2008)(footnote omitted).  The State court went on to hold that the claims made in Petitioner's second application for post-conviction relief and related pleadings did not "suggest either a miscarriage of justice or the substantial violation of a constitutional or statutory right." <u>Id.</u> at 5.

A federal habeas court "does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." <u>English v. Cody</u>, 146 F.3d 1257, 1259 (10th Cir. 1998); <u>see also</u> <u>Coleman</u>, 501 U.S. at 750;  <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1140 (10th Cir. 2007).  While state procedural bars that preclude consideration of ineffective assistance claims are viewed "with a healthy degree of skepticism . . . this does not preclude a finding that a state procedural rule is adequate to bar federal review of ineffective assistance of counsel claims." <u>Smallwood v. Gibson</u>, 191 F.3d 1257, 1268 (10th Cir. 1999).  Petitioner argues Oklahoma's procedural rules are not adequate or independent, and even if they are, cause and prejudice exists to excuse the procedural

default (Pet. at 143-45; Reply at 1-18; Amendment and Addendum to Habeas Petition at 1-2). In addition, Petitioner submits that failure to consider his claims would result in a miscarriage of justice. Id.

### a. Oklahoma's Procedural Bar Remains Independent and Adequate

Whether a State's procedural bar is independent and adequate is a federal question. Lee v. Kemna, 534 U.S. 362, 375 (2002) (citing Douglas v. Alabama, 380 U.S. 415, 422 (1965)). A state procedural default rule is considered adequate if "the state rule in question is 'firmly established and regularly followed.'" Beard v. Kindler, 558 U.S. ___, 130 S.Ct. 612, 617-18 (2009) (quoting Lee, 534 U.S. at 376); Smith v. Workman, 550 F.3d 1258, 1274 (10th Cir. 2008). The relevant inquiry is whether a State's procedural rule was adequate "when the purported default occurred." Clayton v. Gibson, 199 F.3d 1162, 1171 (10th Cir. 1999); see also Walker v. Att'y Gen. for State of Okla., 167 F.3d 1339, 1344 (10th Cir. 1999). Whether a state procedural ground is independent requires the Court to determine if it "relies on state law, rather than federal law, as the basis for the decision." English, 146 F.3d at 1259; see also Smith v. Mullin, 379 F.3d 919, 925 (10th Cir. 2004).

The Tenth Circuit has previously held Oklahoma's procedural bar to claims such as Petitioner's to be independent and adequate. Spears v. Mullin, 343 F.3d 1215, 1253-55 (10th Cir. 2003); Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000); Moore v. Reynolds, 153 F.3d 1086, 1097 (10th Cir. 1998); see also Cannon v. Gibson, 259 F.3d 1253, 1266 (10th Cir. 2001) (holding "[a]bsent some alteration of the status quo by the OCCA or the Oklahoma legislature" the panel was bound by "recent Tenth Circuit cases affirming the

adequacy of the Oklahoma procedural bar relating to claims not raised in an initial state petition for post-conviction review").

Petitioner argues subsequent cases in which the OCCA addressed the merits of a claim brought in a second or subsequent application for post-conviction relief render the procedural bar inadequate. In Spears, the Tenth Circuit confronted a similar argument that Oklahoma's procedural bar was inadequate due to instances in which the OCCA considered the merits of an otherwise procedurally barred claim. Spears, 343 F.3d at 1253-55. Spears submitted four OCCA decisions to illustrate the uneven application of the State's procedural bar. See id. at 1254 ("Spears relies on Valdez v. State, 46 P.3d 703, 704-05, 710-11 (Okla. Crim. App. 2002), and unpublished decisions in Hawkins v. State, No. PC 96-1271 (Okla. Crim. App. Mar. 18, 1998), Clayton v. State, No. PCD-2000-1618 (Okla. Crim. App. Dec. 28, 2000), and Brown v. State, No. PCD-2002-781 (Okla. Crim. App. Aug. 22, 2002)[.]"). In reaching its conclusion that Oklahoma's procedural bar was adequate, the Tenth Circuit first distinguished the procedural posture of Hawkins and determined Brown was sufficiently different because the newly raised claim appeared to be based on newly discovered evidence. Id. at 1254 ("We thus conclude that these two unpublished decisions are not sufficiently analogous to inform our determination of whether the OCCA regularly and consistently applies the specific procedural bar it applied in Spears' case."). Valdez and Clayton were analogous in that the OCCA reviewed procedurally barred claims for the first time in a second or successive application for post-conviction relief. However, Spears concluded, "[S]tanding alone, these cases are insufficient to overcome Oklahoma's regular and

consistent application of this procedural-bar rule in the vast majority of cases." Id. at 1254-55 (internal quotation omitted). In sum, under Spears, Oklahoma's procedural bar "remains adequate to preclude federal review." Id. at 1255.

Petitioner does not address the holding in Spears except to state that it has not been found adequate in light of the additional examples of inconsistent application by the OCCA. He cites to subsequent OCCA decisions in which the State court reviewed claims brought on second or successive post-conviction applications, specifically relying upon Slaughter v. State, 108 P.3d 1052 (Okla. Crim. App. 2005), and Malicoat v. State, 137 P.3d 1234 (Okla. Crim. App. 2006). These cases are sufficiently distinct from Petitioner's claims.

In Slaughter, the OCCA reviewed petitioner's claim of actual innocence raised again in his third application for post-conviction relief. 108 P.3d at 1054. The OCCA decided to review the issue after Slaughter "steadfastly maintain[ed] he [had] made a 'clear and convincing showing of actual innocence'" which the OCCA avoided through reliance on procedural bar. Id. The OCCA noted that its "rules and cases do not impede the raising of factual innocence claims *at any stage* of an appeal . . . innocence claims are the Post-Conviction Procedure Act's foundation." Id. Malicoat involved a challenge to Oklahoma's lethal injection protocol, filed as an Objection to Setting of an Execution Date, but construed as a subsequent application for capital post-conviction review. 137 P.3d at 1235. The OCCA considered the merits of Malicoat's claim:

> If [the] claim is correct, then his legal sentence will be carried out in an illegal manner, substantially violating both the United States and Oklahoma Constitutions. This Court has the authority to consider the merits of an issue

which may so gravely offend a defendant's constitutional rights and constitute a miscarriage of justice. In the interests of justice, and considering the importance of the principle of finality of sentences, we reach the merits of Malicoat's claim and deny his request to stay his execution date.

Id. (footnote omitted).

After thorough consideration, the Court concludes Oklahoma's procedural bar remains adequate. See Black, 2010 WL 565285, at *5-13 (rejecting similar challenge to adequacy of Oklahoma's procedural bar). Each of the cited examples provided by Petitioner are sufficiently distinct and do not require this Court to depart from Spears. In addition, two recent Supreme Court cases in the context of discretionary state procedural rules reinforce this Court's determination that Oklahoma's procedural bar is adequate. See Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120 (2011); Kindler, 130 S. Ct. at 612. In Kindler, the Supreme Court held that "a discretionary state procedural rule can serve as an adequate ground to bar federal habeas." 130 S.Ct. at 618. To hold otherwise would place States in a dilemma:

> States could preserve flexibility by granting courts discretion to excuse procedural errors, but only at the cost of undermining the finality of state court judgments. Or States could preserve the finality of their judgments by withholding such discretion, but only at the cost of precluding any flexibility in applying the rules.

Id. States may choose "mandatory rules to avoid the high costs that come with plenary federal review" and such a result "would be particularly unfortunate for [petitioners], who would lose the opportunity to argue that a procedural default should be excused through the exercise of judicial discretion." Id. Martin applied Kindler and concluded California's

timeliness requirement for state habeas corpus petitions, which instructs petitioners to file "as promptly as the circumstances allow" was adequate. The Court reasoned, "A discretionary rule ought not be disregarded automatically upon a showing of seeming inconsistencies." Martin, 131 S.Ct. at 1130. The Supreme Court's approval of discretionary state procedural bars buttresses this Court's conclusion: distinguishable instances in which the OCCA applies exceptions to its procedural bar do not necessarily render the entire procedural rule inadequate.

Petitioner next argues that the Oklahoma procedural bar is not independent because application of the bar requires the OCCA to determine, either explicitly or implicitly, the merits of Petitioner's federal constitutional claim. See Ake v. Oklahoma, 470 U.S. 68 (1985). (Reply at 7.) Respondent argues that multiple decisions of the Tenth Circuit recognize the independence of Oklahoma's procedural bar to claims not raised on initial post-conviction review. See Spears, 343 F.3d at 1253-55; Cargle v. Mullin, 317 F.3d 1196, 1212, n.15 (10th Cir. 2003); Cannon, 259 F.3d at 1265-66; Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000); Moore v. Reynolds, 153 F.3d 1086, 1097 (10th Cir. 1998). (Resp. at 50.)

Petitioner's reliance on Ake is misplaced. In Ake, the Supreme Court determined that Oklahoma's fundamental trial error exception to waiver on direct appeal "depend[ed] on an antecedent ruling of federal law" and required the State court to "rule, either explicitly or implicitly, on the merits of the constitutional question." 470 U.S. at 75. As a result, the state ground was not independent of federal law, thereby permitting the Court to review the merits

31

of Ake's claim. Id.  However, Ake was reviewed on direct appeal and the Supreme Court has never applied its rule in the federal habeas context.  Coleman, 501 U.S. at 741. Accordingly, Ake has no bearing on the independence of Oklahoma's bar in this case.

Recently, the Tenth Circuit provided guidance in Gardner v. Galetka, 568 F.3d 862 (10th Cir. 2009).  Even though the Tenth Circuit ultimately addressed the merits of the petitioner's claim, the Court explained:

> We do not think that a state's decision to allow exceptions to its procedural bar in the interest of preventing "fundamental unfairness," which requires an examination of the merits, makes the underlying bar any less procedural. If this were so, any procedural bar with an exception based on avoiding a fundamental miscarriage of justice would lose its character as an independent procedural ground under Michigan v. Long, 463 U.S. 1032, 103 S. Ct. 3469, 77 L.Ed.2d 1201 (1983).

Id. at 884; see also Stewart v. Smith, 536 U.S. 856, 860-61 (2002) (noting a State court's review of the underlying merits of a claim does not necessarily mean the claim was decided upon the merits).

The Oklahoma procedural bar applied to preclude review of Petitioner's claims of ineffective assistance of counsel brought for the first time in his *Second Application for Post Conviction Relief* remains independent and adequate.

> b.     Cause and Prejudice

Petitioner asserts briefly that to "any extent appellate counsel's failure to raise or support the claims presented in this Petition results in a federal procedural default, appellate counsel was ineffective." (Pet. at 144.)  Apparently, he claims ineffective assistance of appellate counsel as a basis to provide cause and prejudice sufficient to overcome application

of the procedural bar. "[C]ause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Coleman, 501 U.S. at 753. Procedural default may be excused if it occurs as the result of ineffective assistance of counsel. Carrier, 477 U.S. at 488.

Respondent submits Petitioner cannot establish cause for the default under Edwards v. Carpenter, 529 U.S. 446 (2000). Edwards holds that when a separate claim of ineffective assistance of counsel is offered as cause to excuse procedural default of another claim, that claim of ineffective assistance must not itself be defaulted. Id. at 453; see also Johnson v. Gibson, 254 F.3d 1155, 1159-60 (10th Cir. 2001). Here, Petitioner simply claims ineffective assistance of appellate counsel serves as the cause to excuse the procedural default of his claims of ineffective assistance of trial counsel. Petitioner did not raise ineffective assistance of appellate counsel until his *Second Application for Post Conviction Relief*. Since Petitioner's ineffective assistance of appellate counsel claim is procedurally barred, he cannot use it to establish cause for his default. Because Petitioner fails to establish cause, the Court need not analyze actual prejudice. See Coleman, 501 U.S. at 750 (requiring party to demonstrate both cause and actual prejudice to meet exception to procedural bar).

c. Fundamental Miscarriage of Justice

In a final attempt to avoid application of a procedural bar, Petitioner argues the Court should consider his claim under the "miscarriage of justice" exception. (Pet. at 145.) "To come within this very narrow exception, the petitioner must supplement his habeas claim

with a colorable showing of factual innocence." <u>Demarest v. Price</u>, 130 F.3d 922, 941 (10th Cir. 1997) (internal quotation and citation omitted). Petitioner must demonstrate "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." <u>Sawyer v. Whitley</u>, 505 U.S. 333, 336 (1992). This inquiry focuses "on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error. <u>Id.</u> at 347.

Petitioner claims, without specific identification, that he has presented throughout the Petition compelling evidence of innocence – both of the offense and the death penalty – not heard by his capital jury. (Pet. at 145.) Review of the Petition, however, does not reveal any evidence of actual innocence of the murders. Any evidence possibly tending to go to innocence would be to legal innocence as opposed to factual innocence and is insufficient for a miscarriage of justice claim. <u>Beavers v. Saffle</u>, 216 F.3d 918, 923 (10th Cir. 2000) (holding that for a criminal defendant to establish a fundamental miscarriage of justice, he "must make a colorable showing of factual innocence"). Accordingly, the miscarriage of justice exception does not apply.

After consideration of Petitioner's arguments, the Court concludes his claims of ineffective assistance of counsel first argued in his *Second Application for Post Conviction Relief* are procedurally barred from habeas review. Relief on those claims is therefore denied.

*Remaining Claims of Ineffective Assistance of Counsel.*

To prevail on a claim of ineffective assistance of counsel under the Sixth Amendment, Petitioner must first show that his counsel "committed serious errors in light of 'prevailing professional norms'" in that the representation fell below an objective standard of reasonableness. See Strickland v. Washington, 466 U.S. 668, 688 (1984). In so doing, Petitioner must overcome the "strong presumption" that his counsel's conduct fell within the "wide range of reasonable professional assistance" that "'might be considered sound trial strategy,'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). He must, in other words, overcome the presumption that his counsel's conduct was constitutionally effective. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993). A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994), and, therefore, may not be predicated on "'the distorting effects of hindsight.'" Parks v. Brown, 840 F.2d 1496, 1510 (10th Cir. 1987), quoting Strickland, 466 U.S. at 689.

If constitutionally deficient performance is shown, Petitioner must then demonstrate that "there is a 'reasonable probability' the outcome would have been different had those errors not occurred." Haddock, 12 F.3d at 955 (citing Strickland, 466 U.S. at 688, 694); Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). In the specific context of a challenge to a death sentence, the prejudice component of Strickland focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695; quoted in Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992). Petitioner bears the burden of establishing both that the alleged

deficiencies unreasonably fell beneath prevailing norms of professional conduct and that such deficient performance prejudiced his defense. Strickland, 466 U.S. at 686; Yarrington v. Davies, 992 F.2d 1077, 1079 (10th Cir. 1993). In essence, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. "Counsel's performance must be 'completely unreasonable' to be constitutionally ineffective, 'not merely wrong.'" Welch v. Workman, No. 07-5061, 2010 WL 2253534, at *22 (10th Cir. June 7, 2010) (quoting Hoxsie v.Kerby, 108 F.3d 1239, 1246 (10th Cir. 1997)). "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010).

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland] at 689, 104 S.Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles, 556 U.S. at ___, 129 S.Ct. at 1420. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 562 U.S. __, __, 131 S.Ct. 770, 788 (2011).

1.    Testimony Concerning the Windows.

Petitioner first claims that trial counsel was ineffective for "failing to defeat the State's inferential theory or object appropriately" when evidence and argument was presented

implying that Petitioner unlocked a window in the victims' apartment during the discovery of the bodies to make it appear easy for someone to gain access without evidence of forced entry. (Pet. at 46.) In a somewhat complex web of accusations of error, Petitioner claims the prosecution improperly implied Petitioner unlatched a window in the victims' apartment – a window later determined to have been locked – causing jury confusion. Petitioner also finds fault with the treatment of a note from the jury inquiring about the evidence regarding the windows. Petitioner asserts trial counsel should have objected to the prosecutor's closing argument, should have insisted Petitioner be present for discussion of the jury's note, and should have insisted the note be answered appropriately.

On appeal, Petitioner claimed his trial counsel was ineffective for failing to object to improper speculation that he unlocked and opened the south window in the front room while Mr. McInturff was focusing on his son's body. The OCCA denied that claim, holding:

> Second, Appellant faults counsel for permitting Detective Yardley to speculate that Appellant could have unlocked a window in the victims' apartment while Robert McInturff was not looking. Because this conclusion was based on Yardley's personal observations at the crime scene and was corroborated by Mr. McInturff's own testimony, it was not improper; therefore, Appellant was not prejudiced by counsel's failure to object.

Dodd, 100 P.3d at 1049.

Petitioner does not demonstrate the OCCA's determination to this specific claim was unreasonable. Instead, Petitioner broadens his claim as he did in his second application for post-conviction relief:

> Mr. Dodd raised some ineffective assistance of trial counsel claims on direct appeal. Dodd v. State, 100 P.3d 1017, 1049-50 (Okla. Crim. App.

2004). He will endeavor to avoid repetition of those claims here but they are worth considering in terms of counsel's global performance. Unfortunately, the claims raised on direct appeal were not, in general, the most significant ones or the ones that most indicted the performance of trial counsel from the same office. And, two of the issues, a claim that trial counsel permitted speculative evidence and argument about the status of a window in Mr. Dodd's [sic] apartment and a claim about the defense's limited response to the suicide evidence were poorly developed.

*Second Application for Post-Conviction Relief*, PCD-2006-1065, pp. 17-18.

The OCCA reviewed Petitioner's expanded claim of ineffective assistance of counsel for "failing to clear up a possible discrepancy in the evidence as to whether a window at the crime scene was locked or unlocked" and held that the claim was barred because it was not based on newly-discovered facts or new controlling legal authority. <u>Dodd</u>, PCD-2006-1065, slip op. at 3. Trial counsel's actions or inactions concerning the issues regarding the windows, the note sent to the court by the jury about the windows, and Petitioner's presence or absence during the discussion of the note by counsel and the court were apparent from the record yet not raised until the filing of his second application for post-conviction relief (filed after the filing of his Petition in this case). For the reasons stated above, the Court finds Petitioner's newly amended claims to be procedurally barred from habeas review.

        2.        Failure to Adequately Challenge State's Forensic Case.

Petitioner next claims that his trial counsel were ineffective for failing to object to the prosecutor's statements that the blood swipe on Keri Sloniker's foot was a perfect match to Al Ames' knife and for failing to point out that while Luminol indicated traces of blood in the victim's rinsed-out sink, the experts were unable to detect blood on Al Ames' knife

(asserted to be the murder weapon).[10]

On appeal, the OCCA considered the unobjected to "blood-swipe" comment under a claim of prosecutorial misconduct and held that the statement was clarified by considerable forensic expert testimony. Dodd, 100 P.3d at 1040-41. Later in its Opinion, as to ineffective assistance of counsel, the State court held:

> In Proposition 18, Appellant advances a claim that his trial attorneys rendered constitutionally deficient performance which denied him a fair trial. He references several ineffective-counsel claims made elsewhere in his brief, and specifies several more. Because we have found no deficient performance or prejudice in the preceding claims, we focus here on the new claims and on a cumulative assessment of trial counsel's performance.

Id. at 1049.

Petitioner has not demonstrated the OCCA's determination to be unreasonable. As it was not error for the prosecutor to comment on the testimony and facts when stating the blood-swipe matched the knife belonging to Petitioner's co-worker, Al Ames, failure to object to such comment cannot amount to either deficient performance or have resulted in prejudice. (See Ground 5, infra.)

Petitioner's claim of trial counsel failing to challenge the purported discrepancy between the trace indications of blood from the Luminol testing of the sink and the absence of blood on Al Ames' knife has not previously been raised in State court. Petitioner argues this claim is "part and parcel of the issue that was raised." (Reply at 53.) The Court does not

---

[10] Luminol was a chemical used by the crime scene investigators to presumptively test for the presence of blood.

agree. A claim regarding a comment as to a blood-swipe on the victim's foot and one contesting forensic results of traces of blood in the sink compared to the absence of blood on the knife differ significantly in both the substance of the claims and their procedural occurrence during trial. See Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006) (petitioner failed to exhaust claim because presentation of a "somewhat similar" claim is insufficient to fairly present a federal claim before the State court). Petitioner's sub-claim regarding trial counsel's failure to challenge the blood evidence discrepancy is unexhausted and procedurally barred from habeas review.

　　　3.　　Failure to Adequately Deal with Evidence of Attempted Suicide.

　　　While in jail awaiting his first trial, Petitioner prepared two suicide notes and then attempted suicide by cutting his throat with a razor blade. On the fourth day of the instant trial an *in camera* hearing was held regarding the introduction of the attempted suicide and the notes left by Petitioner. The prosecution sought to introduce this evidence to demonstrate a type of flight with consciousness of guilt. The defense argued Petitioner had been prescribed the drug Paxil but was not receiving it in jail, and that one of the effects of withdrawal of the drug was a higher risk of suicide. Defense counsel argued the risk of prejudice from introduction of the evidence was too high due to the similarity in method between the suicide attempt and the manner in which the victims were murdered. Counsel further argued that there was an alternate explanation for the suicide – Petitioner's despondency over being separated from his family as demonstrated by the substance of the note to his wife claiming innocence of the crimes and apologizing for what he was about to

do. The trial court ruled the suicide attempt was an admission by conduct, was not unfairly prejudicial, and that a cautionary instruction similar to an instruction on flight should be given.

Petitioner claims trial counsel was ineffective for failing to offer more in explanation of the suicide attempt and for failing to present expert testimony. He asserts this was failure of his counsel to not only defend with available evidence but also failure to investigate adequately to counter the State's case. He adds counsel was also ineffective by failing to present the report of Lt. McPherson that included a statement allegedly made by Petitioner to Deputy Sheriff Drummond claiming that he attempted suicide because he was not guilty of the crimes. Lastly, Petitioner claims trial counsel was ineffective for proffering a confusing jury instruction of evidence of a suicide attempt. (Pet. at 50-57.)

On appeal, the OCCA first determined that admissibility of the evidence of Petitioner's suicide attempt was proper:

> In Proposition 2, Appellant alleges error in the admission of evidence and argument relating to his post-arrest suicide attempt; in Proposition 3, he alleges that the trial court's instruction to the jury on how to evaluate this evidence was confusing. Approximately a month after his arrest, Appellant attempted suicide in his jail cell. Before committing the act, Appellant wrote letters to his wife and family, despairing of his situation but maintaining his innocence of the crimes. He then cut his neck several times with a razor blade. Appellant quickly had a change of heart and called for help; he was found lying face-down on his bunk. Appellant suffered substantial blood loss and was taken to a hospital where he underwent surgery. While recovering from his wounds, Appellant told an officer, "They're going to kill me anyway, man. I have no witnesses, no alibi, I'm an ex-convict, they don't believe me anyway, I'm a manic depressive and I just don't care."
>
> Evidence of Appellant's two letters, and the circumstances surrounding

41

the suicide attempt, were admitted into evidence over Appellant's objection. Appellant had moved in limine to exclude this evidence. The State argued that Appellant's suicide attempt was relevant as tending to show his consciousness of guilt, i.e. his identity as the perpetrator of the murders. Appellant responded that the evidence was too ambiguous to have any probative value. Both parties maintain these arguments on appeal. Because Appellant timely objected to the evidence in question, he has preserved any error for appellate review.

* * *

Turning to the particulars in this case, we find the evidence of Appellant's attempted suicide was relevant as it tended to show his consciousness of guilt, and the identity of the perpetrator was the primary contested issue in the case. Appellant contends it would have been just as reasonable for the jury to infer that Appellant attempted suicide "out of despondency due to a fear of being unable to prove his innocence." We certainly agree that an innocent inference could be supported by Appellant's own testimony about his depression, the substance of the letters he wrote before the attempt, and the statements he made after it. But Appellant has confused the admissibility of this particular evidence with its sufficiency to support a conviction by itself.

Dodd, 100 P.3d at 1030-31 (citation omitted). Having determined the evidence was admissible, the OCCA turned to Petitioner's claim that trial counsel was ineffective for failing to utilize his medical and psychological records, as well as additional literature regarding the effects of anti-depressant drugs, to challenge the admission of the suicide evidence. The OCCA concluded that the supplemental materials to Petitioner's motion to supplement the appeal record, proffered in support of his claim, did not amount to clear and convincing evidence that trial counsel was constitutionally deficient, so as to warrant an evidentiary hearing. In determining Petitioner had failed to meet his burden, the OCCA added in a footnote:

> With respect to evidence of Appellant's suicide attempt, the application contains literature about the effects of various anti-depressant drugs, as well

42

as evidence of Appellant's medical and psychological records. Appellate counsel has provided an affidavit stating that the records were obtained from trial defense counsel's files. Although Appellant provides no information as to whether trial counsel considered using this information, the record shows trial counsel was aware of the following: (1) that according to records obtained from Appellant's employer, he had been prescribed Paxil, an anti-depressant, "sometime in November" of 1994;[11] (2) that Appellant had allegedly not been receiving this medication while in jail after his arrest; and (3) that there was some question in the medical literature as to whether abrupt withdrawal from Paxil can have serious side-effects, including the precipitation of suicidal thoughts. What the record does not show, and what Appellant fails to demonstrate with his supplementary materials, is (1) any evidence that he was, in fact, taking Paxil at any time during the approximately one week of November 1994 before he was arrested; (2) any evidence that taking Paxil for such a short period of time has any effect on suicidal ideation; or (3) any evidence that taking Paxil for even a very short period of time can induce suicidal ideation a month after the medication is ceased. These are important facts that we cannot simply presume.

The medical records Appellant includes in his supplementary materials show Appellant was examined for depression in February 1996;[12] that he has a history of seizures; that in March 1982, he made a suicidal gesture with prescription drugs after an argument with his mother; and that in November 1982, he made a similar gesture "and tried to outrun a police officer" after having problems at the alternative school he had been attending. Appellant has not demonstrated, by clear and convincing evidence, that trial counsel was ineffective for not presenting this information in connection with Appellant's December 1994 suicide attempt. First, the brief self-referral psychological evaluation from February 1996, over a year after Appellant was jailed and charged in this case, is of little value. The fact that other traumatic events in

---

[11] The victims' bodies were discovered on November 7, 1994.

[12] Petitioner contends the OCCA made an erroneous factual determination finding that his treatment for depression with Dr. Darbe came after the suicide attempt. Petitioner contends the records demonstrate the treatment was in 1994 and not 1996. Respondent responds that the handwritten medical form presented to the OCCA as an attachment to Petitioner's Rule 3.11 application appears to state the year of 1996, and that Petitioner's appellate counsel listed the date as February 2, 1996 in both his Reply Brief of Appellant and his Amended Reply Brief of Appellant. Despite these discrepancies, Respondent contends that assuming, arguendo, the date was 1994, Petitioner is still not benefitted from the information in that statements made to the doctor nine months before the murders that Petitioner had impulse control problems and felt "like attacking" would not advance his claim of actual innocence. (Resp. at 92, n.11.)

Appellant's remote past might have prompted him to make suicidal gestures does not establish that Appellant is constantly suicidal, easily rendered suicidal, or otherwise mentally ill. Appellant does not raise insanity, diminished capacity, incompetence to stand trial, or mental retardation as issues in this appeal. As for his history of seizures, Appellant fails to demonstrate how this evidence would bear on the suicide attempt in any way. Appellant himself told the jury about his history of depression, and gave an innocent explanation for his December 1994 attempt; his protestations of innocence were recorded in the letter he wrote to his wife, which was admitted into evidence. Whatever the impetus for Appellant's post-offense suicide attempt, the more probative fact from the State's point of view was the manner in which he attempted it. Finally, the records Appellant proffers include numerous references to Appellant's history of adolescent drug use and general antisocial and aggressive behavior – a line of inquiry that trial counsel might reasonably have chosen to avoid.

Id. at 1051 n.14.

The OCCA refused to grant Petitioner an evidentiary hearing to consider the non-record evidence because the supplemental materials did not amount to clear and convincing evidence that trial counsel was constitutionally deficient. The OCCA's standard does not replicate the federal standard and, therefore, does not constitute an adjudication on the merits. This Court does not, therefore, owe deference to the OCCA's rejection of this ineffectiveness claim and must review it de novo. See Wilson v. Workman, 577 F.3d 1284, 1300 (10th Cir. 2009). Even without affording deference, however, Petitioner's claim fails. The supplemental material submitted by Petitioner includes potentially damaging notations of Petitioner's problems with impulse control and that he would sometimes feel "like attacking.. As identified by the OCCA, the material did not establish when or if Petitioner was taking Paxil, if it was before the murders, and if he ever abruptly stopped taking the drug. As an alternative to proceeding with the Paxil information, Petitioner was able to testify and explain

the reasons for his depression.  Further, evidence was presented in the form of his letter to his wife protesting his innocence – potentially a more sound strategy in light of his defense that someone else committed the murders.  Petitioner has not demonstrated trial counsel's performance was constitutionally deficient or that he was prejudiced by the omission of this supplemental information.

Next, as to the jury instruction[13], the OCCA determined:

> Because we find the evidence of Appellant's suicide attempt admissible, we need only consider whether the jury instruction regarding it was so confusing as to have misled the finder of fact.  We first note that the instruction was prepared by defense counsel and given without objection by the State or modification by the court.  Appellant now argues that the trial court erred in giving the instruction that his attorney crafted because he never denied attempting suicide, and because he never admitted committing the murders.  These considerations are derived from language in cases dealing

---

[13]  The challenged instruction read as follows:

EVIDENCE - SUICIDE ATTEMPT

Evidence has been introduced that the defendant cut himself with a razor shortly after the alleged crimes were committed.  You must first determine whether this action by the defendant constituted a suicide attempt.

To find that the defendant attempted suicide for purposes of this instruction, you must find beyond a reasonable doubt each of the following:

FIRST:  The defendant attempted to take his life;

SECOND:        With a consciousness of guilt;

THIRD: In order to avoid prosecution for the crimes with which he is charged;

The defendant has offered evidence explaining his acts.  You must consider the claim of the defendant in determining if the suicide attempt occurred.

If after consideration of all the evidence of this issue, you find beyond a reasonable doubt that the defendant attempted suicide, then this suicide is a circumstance which you may consider with all the other evidence in this case in determining the question of the defendant's guilt.  However, if you have a reasonable doubt that the defendant attempted suicide, then the fact of any suicide attempt is not a circumstance for you to consider.

(O.R. X, at 1966.)

with evidence of a defendant's flight from the scene of the crime. We have held that flight instructions are improper if they (1) presume, as a matter of law, that unexplained departure from the crime scene demonstrates consciousness of guilt, see Wilson v. State, 96 Okl.Cr. 137, 139-140, 250 P.2d 72, 74-75 (1952); or (2) assume that the person leaving the scene was the defendant, when that fact is in dispute, see Mitchell v. State, 1993 OK CR 56, ¶ 13, 876 P.2d 682, 685. In either case, the court has invaded the province of the jury to determine the facts, and the conclusions to be drawn from them.

Those concerns are not relevant here. The identity of the person committing the post-offense conduct-in this case, the suicide attempt – was not in dispute. Nor was the jury told to presume anything about Appellant's conduct. The jury was instructed that it alone should determine whether Appellant's conduct in cutting his own throat was done with both a consciousness of guilt and a desire to avoid punishment, and if so, what weight, if any, should be attached to that evidence. We find the instruction, submitted by defense counsel, was sufficiently clear and fairly stated the applicable law. See Roldan v. State, 1988 OK CR 219, ¶ 10, 762 P.2d 285, 287; Saugstad v. State, 1982 OK CR 26, ¶ 10, 642 P.2d 616, 618. Propositions 2 and 3 are denied.

Dodd, 100 P.3d at 1032.

Petitioner claims the final paragraph of the instruction shows a strong potential for confusion as its phrasing buried the critical elements in the definition of attempted suicide. While it certainly could have been more artfully drafted, the instruction clearly sets forth the necessary elements in a concise manner. Each element is preceded with bold, capital letters indicating that the jury must determine beyond a reasonable doubt the defendant attempted to take his life, with a consciousness of guilt, in order to avoid prosecution. Petitioner has not demonstrated the OCCA's determination that the instruction was sufficiently clear, and that it fairly stated the applicable law, was contrary to, or an unreasonable application of, clearly established federal law. As the determination that the instruction was not confusing

46

or misleading is reasonable, trial counsel cannot be said to have been ineffective for proffering the instruction. Without an error, Petitioner cannot demonstrate a reasonable probability the outcome would have been different had the "error" not occurred, Strickland, 466 U.S. at 694, or that the proffer of an acceptable jury instruction unreasonably fell below prevailing norms of professional competence, id. at 686.

Petitioner adds sub-claims that counsel were ineffective for failing to present expert testimony at the hearing and at trial regarding the suicide attempt, that the prosecutor knowingly presented false evidence regarding a statement allegedly made by Petitioner to a law enforcement officer after the suicide attempt, and that direct appeal counsel was constitutionally ineffective for failing to challenge trial counsel's ineffectiveness. Petitioner did not raise these sub-claims until his second application for post-conviction relief. The OCCA deemed the claims procedurally barred from review as they could have been, but were not, raised in his initial application for post-conviction relief. As discussed elsewhere in this ground for relief and for the reasons stated therein, Petitioner's sub-claims are procedurally barred from habeas review.

4.    Admission of Prior Juvenile Incident in the Penalty Phase.

Petitioner next claims trial counsel was ineffective during the second stage of trial for opening the door during the direct examination mitigation testimony of his grandmother to his prior robbery at age fourteen of a paper boy at knife point.

On appeal, the OCCA considered Petitioner's claim and denied it as to prosecutorial misconduct, admissibility of the evidence, and ineffective assistance of counsel:

In the latter part of Proposition 1, and in Proposition 16(B), Appellant lists numerous instances of prosecutor conduct which, he claims, denied him a fair trial in the punishment stage. We first address the prosecutor's cross-examination of Appellant's grandmother, Mary Dodd, who was presented as a mitigation witness. Mrs. Dodd testified generally about why Appellant was a good person who did not deserve the death penalty. Among other things, Mrs. Dodd said she could not recall Appellant being anything but a "sweet, sweet child." The prosecutor challenged Mrs. Dodd's opinion by asking her if she was aware that at age fourteen, Appellant had robbed a paperboy at knifepoint. Appellant claims this question was improper for several reasons, and suggests that trial defense counsel rendered deficient performance by not successfully avoiding it.

When the defendant calls witnesses to give opinions about his good character, the State may, in cross-examination, explore the basis for those opinions by inquiring into specific instances of the defendant's bad character, whether the character witness is aware of them, and if not, whether the witness's opinion is altered by the revelation. The type of inquiry permissible on cross-examination depends on the type of character evidence offered by the defense. See 12 O.S.2001, § 2401(A)(1), 2405(A).

Appellant complains that the evidence was inadmissible because it related to a juvenile offense. Unlike convictions for felony crimes and crimes of dishonesty, evidence of juvenile adjudications is generally not admissible to impeach a witness's credibility. 12 O.S.2001, § 2609(D). But here, the prosecutor was not presenting evidence of a juvenile adjudication to show that Appellant was not a credible witness; rather, he was inquiring into the underlying bad conduct itself to test another witness's opinion as to Appellant's character – a purpose which is not within the scope of § 2609. See Douglas, 1997 OK CR 79, ¶ 35, 951 P.2d at 665.

We find that Mrs. Dodd's opinion, as to Appellant's general good character as a child, entitled the prosecutor to ask her whether that opinion was formed with knowledge of a specific instance evincing Appellant's character for violence. Parker v. State, 1996 OK CR 19, ¶¶ 34-36, 917 P.2d 980, 987-88, cert. denied, 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997). The conduct in question was not otherwise inadmissible in a capital sentencing proceeding. See Medlock v. State, 1994 OK CR 65, ¶ 41, 887 P.2d 1333, 1346 (defendant's violent conduct as a juvenile is admissible as substantive evidence that he posed a continuing threat to society), cert. denied, 516 U.S. 918, 116 S.Ct. 310, 133 L.Ed.2d 213 (1995). Because the jury did not find

Appellant to be a "continuing threat to society" in the punishment stage, and the evidence in question was not germane to any other aggravator, Appellant cannot demonstrate any prejudice. <u>McGregor v. State</u>, 1994 OK CR 71, ¶ 33, 885 P.2d 1366, 1382-83. As there was no prejudice, we find any prosecutor commentary on this subject in closing argument harmless beyond a reasonable doubt. Besides the lack of prejudice, we find defense counsel's tactical decision to call Appellant's grandmother as a mitigation witness was a reasonable gambit; family members testifying as to a defendant's good character are often essential mitigation evidence, and it was unlikely that evidence of Appellant's bad conduct as a juvenile could have been avoided, particularly as Appellant's mother was also called to testify in mitigation and personally recalled the incident. <u>Strickland</u>, 466 U.S. at 687, 104 S.Ct. at 2064.

<u>Dodd</u>, 100 P.3d at 1043.

The OCCA reiterated its determination later in its opinion:

Finally, Appellant claims counsel should not have opened the door in the punishment stage to evidence that Appellant robbed a paperboy at knifepoint when he was a juvenile, by calling Appellant's grandmother as a mitigation witness. We addressed this issue in our discussion of prosecutor misconduct, see Proposition 16(B), and found neither deficient performance nor unfair prejudice.

<u>Dodd</u>, 100 P.3d at 1050.

Trial counsel's theme in the second stage stressed the good aspects of Petitioner's character and his favorable relationships with his family. This tactic is not necessarily unreasonable considering the alternate path of evidence regarding neglect and abuse taken in his first trial – a trial in which he also received the death penalty. Utilizing Petitioner's grandmother as a mitigation witness was not unreasonable. Her testimony was applicable to the general theme during the second stage. Testimony regarding Petitioner's attack on a paper boy is not more damaging than evidence previously presented of his attack and robbery of an elderly woman in her home or of his attack on a probation officer. Petitioner has failed

to demonstrate the OCCA's determination to be contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts as presented at trial.

As expressed previously, it is never easy to clear <u>Strickland</u>'s high bar. <u>Padilla</u>, 130 S.Ct. at 1485. As to ineffectiveness itself, "[there] is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" <u>Richter</u>, 131 S.Ct. at 790 (citing <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) (per curiam)). The task is even more difficult on habeas review:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

<u>Id.</u> at 787-88. This Petitioner has failed to do so here. Accordingly, Petitioner's fourth ground for relief is denied.

<u>Ground 5:</u>    <u>Prosecutorial Misconduct</u>.

In his fifth ground for relief, Petitioner claims prosecutorial misconduct and overreaching began during voir dire and continued throughout the trial. (Pet. at 70-95.) Petitioner's claims will be addressed as they were presented in his Petition with references to the OCCA's determination specific to each of the sub-claims included, where applicable.

The deferential standard of review under 28 U.S.C. § 2254(d) is required since the OCCA adjudicated Petitioner's prosecutorial misconduct claim on the merits. <u>See</u> <u>Walker v. Gibson</u>, 228 F.3d 1217, 1241 (10th Cir. 2000), <u>abrogated on other grounds by</u> <u>Neill v.</u>

Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Petitioner does not demonstrate that the prosecutor's misconduct denied him a specific constitutional right. The appropriate standard for a prosecutorial misconduct habeas claim, therefore, is "'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974)). Accordingly, "it is not enough that the prosecutor's remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (citation omitted). A prosecutor's improper remarks require reversal of a conviction or sentence only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643, 645. The fundamental fairness inquiry requires an examination of the entire proceedings and the strength of the evidence against Petitioner, both as to the guilt stage and the sentencing phase. Id. at 643.

A.      Burden of Proof.

Petitioner claims that during voir dire the prosecutor improperly attempted to define the burden of proof by stating beyond a reasonable doubt did not mean beyond any doubt, and that he then tried to reduce the State's burden of proof when discussing circumstantial evidence by arguing the absence of evidence equates to a cunning killer rather than an innocent man. (Pet. at 71-73.)

During voir dire, the prosecutor stated: " By definition, the folks who have no doubt are parties or they're witnesses. And so what that means, and I'm not trying to gloss it over, is that that is a lower, that's a different deal than beyond any doubt. Does that make sense,

51

Mr. Brown?" (Tr., Vol. I, p. 204.) Petitioner asserts such comments have warranted admonishment from the OCCA, but acknowledges such "error" is typically held to be harmless. Respondent responds that this claim regarding the comment by the prosecutor was not raised in State court and that it is procedurally barred from habeas review. Petitioner does not argue to the contrary, but states that even if "Mr. Dodd was not fortunate enough to have had [individual claims] raised early in his case, the Due Process analysis requires the prosecutor's misbehavior to be analyzed in context." (Reply at 61-62.)[14]

There is no question that the OCCA would deem Petitioner's burden of proof claim procedurally barred if now presented in a third application for post-conviction relief. See Okla. Stat. tit. 22, § 1086; Medlock v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000)("Oklahoma deems waived claims that were not raised in an initial application for post-conviction relief in a death penalty case."). He may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Petitioner has neither asserted cause and prejudice to excuse this default, nor demonstrated that this Court must review this portion of his claim to prevent a fundamental miscarriage of justice. Accordingly, Petitioner's "burden of proof" definition sub-claim is procedurally barred from habeas review.

---

[14] Petitioner raised a claim on appeal that it was error for the trial court to fail to instruct on the definition of reasonable doubt. The OCCA held that the trial court properly refused to define reasonable doubt for the jury. Dodd, 100 P.3d at 1049, n.13.

The OCCA reviewed Petitioner's claim that the prosecutor's discussion of the nature of a circumstantial evidence case and that perpetrators who plan and carry out a murder attempt to conceal their participation in the crime.

> In Proposition 11, Appellant complains that his jury was tainted when the prosecutor "indoctrinated" prospective jurors about circumstantial evidence. The prosecutor inquired generally about the kinds of evidence the panelists would find helpful, if not essential, in any criminal case. He stayed clear of mentioning the particulars of the evidence that the State actually intended to present. Appellant cites no authority for his claim that the prosecutor's manner of questioning was improper. The purpose of voir dire is to determine whether there are grounds to challenge prospective jurors, for either actual or implied bias, and to permit the intelligent exercise of peremptory challenges. Walker v. State, 1994 OK CR 66, ¶ 12, 887 P.2d 301, 307, cert. denied, 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995). The prosecutor had a right to find out if any prospective jurors were unable, either as a matter of principle or simple misunderstanding, to give circumstantial evidence the same weight accorded to direct evidence, as the law would require them to do. See OUJI-CR (2nd) No. 9-4. In fact, as the State points out, the discussion revealed that one panelist simply could not follow the law in this regard, and she was later excused by the State with a peremptory challenge. We find no error here. Appellant also claims that a presumption of guilt was built around him because portions of the prosecutor's discussion occasionally referred to a hypothetical perpetrator as the "defendant." Having read the entirety of the exchanges in context, we find nothing improper. Dennis v. State, 1994 OK CR 34, ¶ 24, 879 P.2d 1227, 1233-34. This proposition is denied.

Dodd, 100 P.3d at 1029.

Petitioner has done little more than claim the prosecutor's statements and inquiries on voir dire had the effect of lowering the burden of proof. He has provided no authority demonstrating the manner used by the prosecutor was error, nor has he demonstrated the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

53

B.     First Stage Victim Impact.

Petitioner next asserts that, beginning with the first witness in the guilt stage of trial, the prosecutor improperly elicited victim impact testimony and prejudiced the jury with sympathy for the victims' families when he asked Ms. Nelson, Keri Sloniker's mother, to describe the relationships between and among the victims and their two families. Ms. Nelson responded that her daughters were best friends, that the victim was a "mother's girl," and that she would not move away from the city because she did not want to be away from her mother. (Tr., Vol. V, p. 58.)[15] Petitioner further complains of testimony regarding toy stuffed bears in the apartment and a plaque with each of the family members' names on it (Tr., Vol. V, p. 77), that Shane's mother and Keri had become good friends (Tr., Vol. V, p. 148), and of the prosecutor's statement in closing argument regarding a ring given to Keri by Shane that expressed his commitment and intention to marry her. (Tr., Vol. XVI, p. 61.)[16]

Petitioner raised this claim on direct appeal. The OCCA denied the claim through a general statement concluding its review of the claims of prosecutorial misconduct, stating: "We have considered the instances Appellant complains of carefully, in light of the entire

---

[15] The prosecutor's first attempt to ask this question was objected to by defense counsel as "becoming dangerously close to victim impact evidence." The objection was overruled after the prosecutor argued that this line of questioning was relevant to counter the defense that the murders were committed by another. The prosecutor explained he was attempting to establish that the witness and the victims had a close relationship in order for the witness to be able to testify that the apartment was in its normal order and that the victims would have disclosed and discussed with their parents any enemies, money problems, etc. (Tr., Vol. V., pp. 56-57.)

[16] The Court presupposes these statements are the testimony and argument complained of by Petitioner, as he did not specifically identify what portion of the testimony was alleged victim impact testimony, but rather simply stated the prosecutor's misconduct persisted throughout the first stage and cited to several pages of transcript testimony.

record, and cannot say that this conduct, alone or in accumulation, affected the outcome of the trial." Dodd, 100 P.3d at 1041.

In a case where the victim's mother testified during the first stage of trial that, among other things, her son was in special education classes, went to church every Sunday and Wednesday, was neat, very obedient, well mannered, and easily led by others, the Tenth Circuit held:

> Holding that the prosecutor's remarks were in error, the OCCA stated that "it is improper for the prosecution to ask jurors to have sympathy for victims" and "it is error to introduce victim impact evidence in the guilt/innocence phase." Powell, 906 P.2d at 777. Nonetheless, the court determined that this error did not deny Powell a fundamentally fair trial. See id. We conclude that the OCCA's decision on this issue was a reasonable application of established Supreme Court precedent. See 28 U.S.C. § 2254(d). We note that Mrs. Thompson's personal remarks about her son constituted but a brief portion of her otherwise relevant testimony, during which she identified the clothing her son had worn the night he was murdered, his personal effects, and his stolen truck, as well as detailing her son's activities preceding the murder, her search for him when he did not return home that night, and her discovering his stolen truck the next morning. Any improper comments, interspersed with this relevant evidence, did not affect the jury's verdict or deny Powell a fair trial. See, e.g., Duckett, 306 F.3d at 991-92 (rejecting habeas challenge to State's first-stage victim-impact argument); Hawkins v. Mullin, 291 F.3d 658, 677 (10th Cir. 2002) (rejecting a habeas claim challenging the State's first-stage evidence concerning the victim's personal history and her attributes as a mother), cert. denied, 537 U.S. 1173, 123 S.Ct. 1012, 154 L.Ed.2d 916 (2003).

Spears v. Mullin, 343 F.3d 1215, 1246-47 (10th Cir. 2003).

As in Spears, the victim's mother's testimony here about her relationship with her daughter and her daughter's boyfriend comprised a brief portion of her testimony regarding the condition of the victims' apartment and the foundation of her knowledge that the victims

were not living in fear of anyone at the time of their murders. Even if these comments regarding their relationship were improper, Petitioner has failed to demonstrate either that the OCCA's determination was unreasonable, or that the comments so infected his trial with unfairness as to deny him due process.

C.      Death Row Comment.

Petitioner claims that during his testimony at trial the prosecutor improperly inquired on re-cross examination that he had been previously sentenced to death, violating the trial court's in limine ruling against any reference to Petitioner being previously convicted and placed on death row. Respondent responds that the OCCA correctly determined Petitioner had previously injected the issue on cross-examination, that any prejudice was brought on by Petitioner himself, and that the OCCA's determination was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts.

On re-cross examination, the prosecutor asked Petitioner the following:

> Q.   I'm sorry. Just on that one limited area. Isn't the truth that you didn't start writing your kids at all? After you got involved with Jo Burnett, you started getting coached on how to look good as a death row inmate?

(Tr., Vol. XV, p. 56.)   Upon objection by defense counsel, the trial court stated:

> THE COURT:   And I've got to tell you that whether he has a pending trial or has been adjudicated, I doubt seriously that this jury has any clue about that. Those are commonly used words that have some technical meaning to those of us who are in the system, but for a common citizen on the street, I don't think that there's any distinction. Now that that's been brought to our attention, I would ask you not to repeat it, but I don't think that's a serious matter.

56

(Tr., Vol. XV, p. 57.)

The above exchange occurred on re-cross examination. Earlier in the trial, on cross-examination, in response to the prosecutor's inquiries about case-descriptive internet content authorized by Petitioner, Petitioner explained that one of the internet sites, the Oklahoma Coalition Against the Death Penalty, was a website not only for him but "for all the prisoners on death row." (Tr., Vol. XIV, pp. 159-60.)

Denying this claim on direct appeal, the OCCA held:

> Appellant claims the prosecutor deliberately tricked him into referring to the fact that he had previously been sentenced to death in this case, and to the fact that he had previously taken a polygraph examination. We find both subjects were brought up by Appellant himself, not the prosecutor. The prosecutor inquired about Internet sites describing Appellant's case and whether Appellant had approved them. He did this to impeach Appellant's credibility, because much of the information about the case on one particular site was simply inaccurate and slanted in Appellant's favor. It was Appellant, not the prosecutor, who described a second organization with Internet information about his case as one for "all prisoners on death row." Defense counsel did not object or ask that the jury be admonished to disregard this answer.

Dodd, 100 P.3d at 1040.

The OCCA further held:

> Although Appellant complains that the prosecutor made comments referring to Appellant's prior trial and death sentence, we note, from the record of voir dire, that many jurors had some vague information about the procedural history of this case. Jurors are not required to be totally ignorant of the case they are empaneled to try. Both counsel and the court took great pains throughout this trial to avoid, as much as possible, any references to "the first trial." We find no evidence that the prosecutor deliberately interjected any information some jurors might not have already known, or that he sought to diminish the jurors' sense of responsibility for determining guilt or innocence and, if necessary, appropriate punishment. Romano, 1995 OK CR 74, ¶¶

49-52, 909 P.2d at 114-15; <u>Brecheen v. State</u>, 1992 OK CR 42, ¶ 11, 835 P.2d 117, 120, <u>cert. denied</u>, 506 U.S. 1085, 113 S.Ct. 1063, 122 L.Ed.2d 368 (1993).

<u>Id.</u>

The complained of instances referring to death row were initially raised by Petitioner. Petitioner has not identified how he was "tricked" into revealing such information, nor how the prosecutor's brief reference to death row in re-cross examination prejudiced him more than his own previous admission. Petitioner has failed to demonstrate the OCCA's determination to be unreasonable, or that the prosecutor's statement deprived him of a fundamentally fair trial.

      D.     Polygraph and Invocation of Rights.

Petitioner claims prosecutorial misconduct is responsible for testimony regarding a polygraph test and the invocation of his right to an attorney. He claims these were all improper topics for jury consideration and asserts the prosecutor's comments penalized him for exercising his Fifth and Sixth Amendment rights. (Pet. at 75-77.)

During cross-examination, the prosecutor was questioning Petitioner about statements made on his website that he had offered to give a urinalysis sample for testing to prove he did not take drugs, but that the police refused. Petitioner agreed that the information on the website was incorrect. The following exchange then occurred:

> Q. Okay. Is there some report that I'm not aware of where you offered to give a UA?
> A. Actually, what it was and it should - -
> Q. No, no, no, no. We've got to be really clear here to avoid a problem with the Judge. What I'm asking you is, are you aware of a report,

58

apparently I'm not, that shows you offered to take a UA?

    A.  Offered, no, that was miswritten.  I was asked to take a UA.

    Q.  And, when is it you're saying you were asked to provide a UA?

    A.  By Officer Tony Fike before the end of the interview.

    Q.  Were there other tests that you were asked to take - - this is a yes or no question - - that you refused?

    A.  Not that I refused.  I was asked to take a polygraph.

    Q.  And did you do that?

    A.  No, at that point I asked, you know, I said, "I need to speak to an attorney."  I didn't tell them, no, and I have since taken a polygraph.

    Q.  And for the State or one of your experts?

    A.  It was for our own expert.

    Q.  Okay.  Not one for us?

    A.  Actually, it was for the Bar Association.

    Q.  For the State?

    A.  No, it was an expert the State endorsed.

    Q.  Now, let me get back to the rest of your statement.  The authorities did not do any tests and so you were asked to take the UA, and did you take that?

    A.  No, he then asked me about the polygraph.  Whenever I said that I needed to speak to an attorney I wasn't sure about the polygraph, I didn't know what it was about.  I had taken a drug test.

    Q.  This is so easy.  All you have to say is, no, I didn't.

    A.  No.

(Tr., Vol. XIV, pp. 166-68.)

The following day, during re-cross examination, Petitioner's previous testimony was

re-visited and the following exchange took place:

    Q.  (BY MR. WINTORY) So you knew before you took the stand that you weren't supposed to, because polygraph evidence isn't admissible for lots of reasons, you knew before you took the stand from your own lawyers you weren't supposed to do it?

    A.  I knew that it was admissible, the results were inadmissible in court.

    Q.  I'm asking you yesterday about your web site where you say in your web site, Rocky Dodd offered to take a UA and the police wouldn't do it, and you used that as your opportunity to try and get in front of the jury with the idea being, which you knew it was, to try and get in over what your

lawyers had told you the polygraph stuff, right?
> A.   I did introduce the polygraph, yes.
> Q.   Kind of a conscious choice on your part, one more thing?
> A.   Yes, it was.

(Tr., Vol. XV, pp. 21-22.)[17]

Petitioner raised on appeal the claim regarding the reference to the polygraph.  The

OCCA determined:

> Similarly, Appellant's several references to having taken a polygraph test were
> not responsive to the prosecutor's questions and were not met with any
> objection by defense counsel.  The results of that test were never disclosed.
> The jury was specifically instructed that any references to polygraph tests were
> not for it to consider.  Any error was either waived or cured. Sheppard v. State,
> 1983 OK CR 143, ¶ 3, 670 P.2d 604, 605-06.

Dodd, 100 P.3d at 1040 (footnote omitted).

It is difficult after review of the foregoing testimony to attribute any impropriety

regarding the subject of a polygraph test to the prosecutor.  The above quoted excerpts were

immersed in a section of cross-examination depicting Petitioner attempting to explain away

any perceived discrepancies in his direct examination testimony and to portray himself in a

favorable light – instead of answering the questions presented to him.  Petitioner agreed he

consciously introduced the subject knowing polygraph results were inadmissable in court.

Further, no evidence or testimony was presented of any polygraph results.  Petitioner has not

demonstrated the OCCA's determination to be contrary to, or an unreasonable application

of, clearly established federal law.  Conversely, he has acknowledged the Tenth Circuit has

---

[17]  No objection was raised by defense counsel to any reference to a polygraph or to Petitioner's comment
of requesting to speak to an attorney.  The jury was provided a written instruction that any references to polygraph
tests were not to be considered. (O.R. at 1967.)

held that a brief reference to a polygraph test can be harmless. <u>Thornburg v. Mullin</u>, 422 F.3d 1113, 1124-25 (10th Cir. 2005). Petitioner has not demonstrated that the mention of polygraph tests so infused his trial with unfairness as to deny him due process of law.

Petitioner's claim that the prosecutor improperly elicited testimony commenting on his invocation of the right to counsel was not raised in State court and is, therefore, unexhausted and procedurally barred from habeas review. (<u>See</u> Ground Four, <u>supra</u>) Even if properly before this Court, however, his claim would fail. Petitioner offers nothing more than unsubstantiated accusation that the prosecutor improperly elicited his statement regarding needing to speak to an attorney. Review of the transcripts demonstrate the reference to an attorney was an unsolicited statement to a question about other tests he may have been requested to take at the time of his interview with investigators – a question requiring only a yes or no answer.

E.      Evidence and Argument Regarding Windows.

The victims often left their apartment's living room window closest to the door unlocked to allow access into their apartment without a key. This keyless alternative to entering the apartment was known to many of the victims' friends and family. At the time the victims' bodies were discovered, Shane McInturff's father attempted to enter the apartment through the window but found it to be locked. A different living room window, farther from the front door, was later found to be unlocked and slightly ajar. Petitioner claims the prosecutor "confused witnesses, misstated evidence, and misled the jury concerning the status of the window in the victims' apartment, culminating in a suggestion

Mr. Dodd tampered with a window when the bodies were discovered." (Pet. at 78.)

Petitioner cites to the State's closing argument in support of his claim:

> There's only one person on this planet who had access and a reason to monkey with that window. It's that guy right here, the killer.

(Tr., Vol. XVI, p. 46.) Respondent responds Petitioner's claim was not raised until his second application for post-conviction relief and was procedurally barred, thereby barring it from habeas review. Alternatively, Respondent asserts that even if not barred from review, Petitioner would not be entitled to relief as the prosecutor's comments were reasonable inferences based on the evidence presented at trial and that Petitioner has failed to demonstrate he was deprived of a fundamentally fair trial. (Resp. at 126-27.)[18]

In its opinion, the OCCA references a statement by the prosecutor regarding Petitioner unlocking the window. It is not apparent, however, whether the reference was to a comment made during opening statement or closing argument. Regardless, the OCCA held:

> A single comment made without objection about the incriminating force of the homicide magazines found in Appellant's apartment, reiteration of the medical examiner's testimony that these knife wounds were some of the worst he had ever seen, *implying that Appellant secretly unlocked the victims' living room window when the bodies were first discovered inside the locked apartment (to make it look like the perpetrator entered without permission),* that such evidence required Appellant to "come up with a story," and closing-argument assertions that Appellant was a "brutal amateur" at killing were not improper, but were fair comments and reasonable inferences based on the evidence presented. <u>Harris v. State</u>, 2000 OK CR 20, ¶ 38, 13 P.3d at 500.

<u>Dodd</u>, 100 P.3d at 1041 (emphasis added).

---

[18] Petitioner does not identify in his Petition whether this claim was raised and addressed by the OCCA, nor in his Reply does he contest Respondent's procedural bar assertion.

Whether or not procedurally barred, Petitioner's claim fails. The subject of the particular window and whether it was locked or unlocked was thoroughly explored both on direct and cross-examination. Additionally, defense counsel argued in closing argument there was no evidence to establish that Petitioner had altered the window – his fingerprints were not found on the window, and the drapes and items in front of the window found ajar reasonably established he did not alter it. (Tr., Vol. XVI, pp. 142, 144-45.) As determined by the OCCA, the prosecutor's argument was a fair comment and a reasonable inference based on the evidence presented at trial. Petitioner has not demonstrated the OCCA's determination to be unreasonable, or that the statement denied him a fair trial.

F.      Personal Opinion.

Petitioner next complains of several statements made by the prosecutor during voir dire, claiming that "repeated expressions of personal opinion during voir dire were improper, deliberate prosecutorial misconduct, and constituted reversible error." (Pet. at 83-84.) Respondent asserts all but one of the specific statements are unexhausted and procedurally barred from habeas review. Whether or not the claim was addressed in State court is questionable. Petitioner does not cite to the OCCA's opinion, nor does he refute Respondent's assertion. Yet, the following was determined by the OCCA on Petitioner's direct appeal:

> Appellant lists several other instances of guilt-stage prosecutor commentary which he contends were improper. Most were not met with a timely objection, and we find no reversible error in any of them. There was nothing improper about the prosecutor stating, in voir dire, that the State would specifically ask for the death penalty in this case, and Appellant cites no

relevant authority holding otherwise.

Dodd, 100 P.3d at 1040. Whether or not each specific claim is unexhausted, the Court may consider them and deny them on the merits despite Petitioner's failure to exhaust his remedies in State court. 28 U.S.C. § 2254(b)(2).

The identified excerpts of voir dire complained of by Petitioner encompass the following:

> [S]o I want to start with one of the most important issues that we've got and that's the death penalty. This is a case where the State of Oklahoma is not only seeking a verdict of guilty for 12 jurors who find beyond a reasonable doubt that this man right here, Rocky Eugene Dodd, is guilty of two counts of Murder in the First Degree but that of the three different punishments the law makes available that he ought to be sentenced to death for the murders of the two victims in this case."

(Tr., Vol. I, p. 190.)

Immediately thereafter, the prosecutor explained that the case was not a civil case or a minor criminal case and that the jury was not there to decide whether someone should have to pay money, but rather one involving "life, life without parole or death." Id. Shortly thereafter, the prosecutor stated:

> You see here in real life the Defendant doesn't look like evil incarnate and whether he looks like an altar boy, I'll leave that to your judgment, but he doesn't look – when the movies want you to think somebody is a killer, they don't look like Defendant, Rocky Dodd, do they? He kind of looks like the guy next door, doesn't he?

(Tr., Vol. I, p. 193.)

Lastly, Petitioner claims "by obverse suggestion," the prosecutor was placing him "somewhere along the continuum" of mass murderers:

I promise you that whatever the evidence is going to be, both sides are going to agree, the Defendant didn't put anybody in barrels and eat them . . . . So while it's a very serious case, it's not going to be – he's not Adolph Hitler, he's not Tim McVeigh, he's not Jeffrey Dahlmer. It's none of that stuff."

(Tr., Vol. I, p. 217.)

The prosecutor's comment was in direct response to one of the juror's statements specifically mentioning Jeffrey Dahlmer and that type of crime as the category of case in which he believed he could impose the death penalty. The prosecutor's statement and his following questions and comments were to determine whether the prospective juror could impose the death penalty in instances other than an extremely brutal murder. <u>Id.</u> He twice re-emphasized the case was not of the nature of Jeffrey Dahlmer. <u>Id.</u> ("[B]ecause I'm telling you, we're not in Jeffrey Dahlmer land."); <u>Id.</u> at 218 ("That's not Jeffrey Dahlmer.").

The prosecutor did not compare Petitioner to any notorious murderers. Any reference to other murderers was made to inquire of the potential jurors as to whether, if the State proved its case, they could impose all three potential sentences, and to clarify any preconceived opinions regarding what crimes a particular potential juror believed warranted a penalty of death. Considered together, or separately, Petitioner has not shown the prosecutor's statements so infected the trial with unfairness as to make the resulting conviction a denial of due process. Nor has Petitioner demonstrated the OCCA's determination to be unreasonable.

G.      False, Misleading and Improper Argument.

Petitioner next claims *in toto* the following: "The prosecutor argued Lisa Eubank Way

65

'described the Defendant's eyes as black when he came through the door' to speak with Shane. Tr. XVI 32. There was no such testimony. Material misstatement is serious prosecutorial misconduct in closing argument." (Pet. at 84)(state citation omitted). Respondent first responds that this claim was not raised in State court and is, therefore, unexhausted and procedurally barred. 28 U.S.C. § 2254(b)(2). Alternatively, Respondent argues relief is unwarranted because a transcript of Ms. Way's November 8, 1994 audiotaped interview with the Edmond Police was used at trial as a demonstrative exhibit while the audiotape was published to the jury. (Tr., Vol. VII, 129-35.) In her interview, when describing Petitioner coming through the door of the victim's apartment, Ms. Way stated: "And the door was just right there and when he came in his eyes were all black." (State's Exhibit 157b & 157c, p.9.) As the prosecutor's argument was an accurate recitation of the evidence presented at trial, Petitioner's claim is denied.

  H.  Blood Swipe Evidence.

  Petitioner claims the prosecutors misrepresented in opening statements and continuing throughout the first stage of trial that the blood swipe evidence on Ms. Sloniker's foot was a perfect match to the knife borrowed by Petitioner from Al Ames and returned to him the day after the murders. Respondent responds that the OCCA's determinations were reasonable in light of the factual determinations and governing Supreme Court precedent.

  Petitioner identifies several specific statements made by the prosecutors in support of his claim. During opening statement, the prosecutor stated, without objection, that the blood swipe on Ms. Sloniker's foot was a perfect match with the knife Petitioner returned to Al

Ames. (Tr., Vol. V, p. 85.) Several days later, during the direct examination of one of the investigators, while the prosecutor was inquiring about the processing of the crime scene, the question was asked: "Now, the jury heard my colleague, Ms. Williams, tell them that they could expect to see some evidence of a knife swipe on Keri Jean Sloniker's foot that matches a blade that he returned to a fella named Al Ames." (Tr., Vol. VIII, pp. 138-39.) During closing argument, the prosecutor argued: "We know that this swipe fits to a T the Al Ames knife right up to the very top ridge of it leaving that eighth of an inch where the knife bows out of the very top ridge, it fits it that closely down to the hollow place at the belly of the blade." (Tr., Vol. XVI, p. 71.)[19] Petitioner then adds to his list from the prosecutor's closing argument: "[W]e know this [the Al Ames knife] is the murder weapon beyond a reasonable doubt." (Pet. at 85, citing Tr., Vol. XVI, pp. 76-77) (emphasis omitted.)[20] Petitioner last identifies the portion of closing argument when the prosecutor showed the jury State Exhibits 81A and 23 and stated: "so when you place 81A against number 23, you see how it matches." (Tr., Vol. XVI, p. 174.)[21]

On appeal, the OCCA made two determinations regarding Petitioner's claim when

---

[19] Prior to this statement, the prosecutor argued: "Ms. Hammarsten makes a big deal how any straight edge could account for the foot swipe on Keri's foot. Well, yeah, but all of the evidence taken together says we know there's a bloody knife." Id.

[20] The full quotation is: "We know that the killer acquired a weapon exactly like this. Now, was it some other weapon? Well, to draw that inference from the circumstantial evidence you have to take all of the evidence together. Taking all of the evidence together, we know this is the murder weapon beyond a reasonable doubt." (Tr., Vol. XVI, p. 76.)

[21] This statement was made during the prosecutor's argument about the reasonable inferences that can be drawn from the evidence. Id.

denying relief. As to the "perfect match" comment, the State court determined that "[t]he prosecutor's comment, during opening statement and without objection, that the blood swipe on Sloniker's foot was a 'perfect match' with Ames's knife was clarified by considerable forensic expert testimony on the subject." Dodd, 100 P.3d at 1040-41. The court further determined that the other comments, collectively, were not error:

> Both experts made it clear that they could not "match" any particular knife to the blood swipe, although they felt confident that the knives in Appellant's own collection were too narrow to have made the mark. Defense counsel chose to highlight that fact in cross-examination. The prosecutors' comments at various points during trial that Ames's knife matched the swipe (or words to that effect) were at times overstated, but the jury was instructed that these comments were not evidence; and as noted, the limitations of the evidence itself were apparent from the expert testimony. In fact, in final closing, the prosecutor invited the jurors to handle the physical evidence during deliberations and determine the issue for themselves.

Id. at 1038.

Petitioner adds that the misconduct continued when the prosecutor retrieved the Ames knife from a witness. Petitioner claims the prosecutor was anticipating that Petitioner would be the next witness when he said: "You all's next witness I'm going to keep this away from . . . ." (Pet. at 86.) This statement was made during the State's cross-examination of Petitioner's expert, Ed Hueske. Immediately following, the trial court admonished the prosecutor: "You don't know who their next witness is gong to be and don't make a comment like that again." (Tr., Vol. XIII, p. 145.)[22]

---

[22] After the completion of Mr. Hueske's testimony, and after an in camera hearing and in camera testimony, Petitioner was called to testify by the defense. (Tr., Vol. XIII, p. 185.) Clearly, the gratuitous comment by the prosecutor should not have been made, and the trial court was correct in its admonition. But beyond the admonition, no relief was requested by defense counsel, and Petitioner took the witness stand only after significant delay in the

As the State court explained, neither expert could state with certainty that the Ames knife was the murder weapon, only that the blood swipe was consistent with the size and shape of the Ames knife and inconsistent with the knives owned by Petitioner. Evidence was further presented that no blood was detected on the Ames knife. Conversely, however, the jury also heard testimony and evidence supporting a reasonable inference that the knife was the weapon used in the murders.

> The State's forensic experts' findings were relevant to the manner in which the victims were killed. The limitations of their methodologies, and the resulting qualifications on their conclusions, were thoroughly explored in cross-examination and through the presentation of defense expert testimony. The jury was not misled, either by testimony or argument, as to the inferences which could be drawn from this evidence.

Dodd, 100 P.3d at 1038.

A prosecutor may comment on and draw reasonable inferences from evidence presented at trial. See Hooper v. Mullin, 314 F.3d 1162, 1172 (10th Cir. 2002). Petitioner has not demonstrated the OCCA's determination was unreasonable or that the comments about the knife so infected the trial with unfairness as to deny him due process.

I.      Improper Vouching.

Petitioner next characterizes several comments and questions by the prosecutor as "vouching," and claims the exchanges improperly enhanced the prosecutor's credibility as an advocate with personal knowledge of the crime scene and improperly bolstered the State's experts' credibility with the jury. (Pet. at 86-88.) Respondent responds that the claims are

_____

proceedings from the jury's perspective, as mentioned above.

exhausted and that the OCCA's determination is not unreasonable. (Resp. at 134-37.)

Petitioner divides his claim into three areas. First, during the direct examination of technical investigator Rocky Yardley, Petitioner claims the prosecutor bolstered the witness by questioning him about irrelevant cases he had investigated prior to these murders.[23] Next, Petitioner raises the same bolstering claim in reference to the prosecutor's direct examination of Captain Tom Bevel, and adds that inquiries into the fact Mr. Bevel had originally been contacted by the prosecutor and requested to assist in the investigation enhanced the prosecutor's credibility as an advocate with personal knowledge of the crime scene. Lastly, Petitioner claims the prosecutor's use of the word "we" in closing argument when talking about the evidence was an "insidious style of inferential vouching and bolstering" that improperly stated his personal view of the evidence.[24]

The OCCA considered Petitioner's complaints and determined that in light of the entire record it could not find, alone or collectively, that the prosecutor's conduct affected the outcome of the trial. Dodd, 100 P.3d at 1041. Petitioner has failed to demonstrate that the State court's determination was unreasonable. The prosecutor's questioning of the witnesses, both of whom were involved in the investigation, of unrelated crimes in the

---

[23] Over defense objection, Mr. Yardley was questioned about his involvement in the investigations of the Edmond Post Office shootings, the Jimmie Ray Slaughter case, and the Oklahoma City Bombing. (Tr., Vol. VIII, pp. 120-26.) The prosecutor confirmed with the witness that Petitioner had nothing to do with these cases, only that they were examples in difficult circumstances where the witness had "occasion to practice [his] craft." (Tr., Vol. VIII, p. 125.)

[24] Petitioner specifically complains of the following: "[W]e know this [the Al Ames knife] is the murder weapon beyond a reasonable doubt" (Tr., Vol. XVI, pp. 76-77.) and "We know that this swipe fits to a T the Al Ames knife . . . ." (Tr., Vol. XVI, p. 71.)

Oklahoma City metropolitan area were relevant to establishing qualifications as an expert by detailing their training and experience. Mr. Yardley's experience with the Edmond Post Office murders was also relevant to explain his opinion testimony of victims' reactions and how one person could have committed these murders.

As to the reference of the prosecutor's presence at the crime scene, review of Mr. Bevel's testimony reveals that the complained of statements were merely an introduction into the explanation of how a captain with the Oklahoma City Police Department came to be involved in the investigation of murders in Edmond, Oklahoma. (Tr., Vol. XI, pp. 133-34.) The majority of Mr. Bevel's testimony consisted of his investigation and did not reference any aid or assistance from the prosecution. Further, the prosecutor did not express any facts regarding the scene other than to summarize in his closing argument the evidence presented during the trial.

The prosecutor's closing argument regarding the knife and the blood swipe were based on testimony received during trial and were inferences drawn from all of the evidence presented. His use of the word "we" appears from the transcript to be a stylized method of closing argument utilized to review evidence learned from examination of the crime scene and the bodies.[25] Petitioner has not demonstrated the complained of statements were the prosecutor's improper "personal view of the evidence," and has further not demonstrated that

---

[25] "Let's take a look." (Tr., Vol. XVI, p. 75.); "Here's what the scene tells us. We know that the killer came to kill." (Tr., Vol. XVI, p. 76.); "We know that that weapon is razor sharp." (Tr., Vol. XVI, p. 76.); "We know that the killer had to know about the credit card checks because even their expert says this [is] focused ransacking." (Tr., Vol. XVI, p. 77.); "We know that the killer has to have a motive. This is not a disorganized crime scene." (Tr., Vol. XVI, p. 78.)

the OCCA's determination was unreasonable or that the comments and argument deprived him of a fair trial.[26]

J.    Name Calling and References to Witnesses as Liars.

Petitioner next claims the prosecutor improperly engaged in name calling and referred to witnesses as liars.  (Pet. at 88-91.)  Specifically, Petitioner is referring only to instances during his own cross-examination and comments about him and his testimony made by the prosecutor during closing argument.  Petitioner complains that during his cross-examination the prosecutor called him either a liar or the synonymous equivalent.[27]  Petitioner complains that later during closing argument the prosecutor engaged in name calling[28] and went on to characterize his pre-trial statements and testimony as "killer lies."[29]

On appeal, the OCCA first held that the closing argument assertions "that Appellant

[26]   As this Court has determined the prosecutor was not expressing personal views, but rather arguing the evidence presented at trial, Petitioner's last minute inclusion of a claim that because he could not cross-examine an unsworn witness his Sixth Amendment right to confrontation was violated is without merit. (Reply at 69-70.)

[27]   "Help me with remorse and truthfulness when we hear it.  Okay?" (Tr., Vol. XIV, p. 93.); "You understand that the State's position is that the things you're saying right now are not even a little bit true?" (Tr., Vol. XIV, p. 114.); "Now, what I'd like to do then is go through these and see whether the story that you're telling today is the truth that will set you free or is just the most current version?" (Tr., Vol. XIV, p. 117.); "This is hard when you're having to do it on the fly, isn't it?" (Tr., Vol. XV, p. 43.).

[28]   An objection to name calling was overruled by the trial court during closing argument when the prosecutor "no less than five times" called Petitioner "a brutal amateur." (Tr., Vol. XVI, pp. 91-93.) (Pet. at 90.)

[29]   "And here's the most powerful thing.  It is the story that a killer would tell.  It's exactly the story the killer would tell." (Tr., Vol. XVI, p. 52.); "And then what spills out of the interview are some important things which show you, again, lies only a killer would tell." (Tr., Vol. XVI, p. 55.); "These wonderful, thought filled, how am I going to handle this when my time comes nuances.  That's killer lies, not I've been in trouble before and don't want to get into trouble again lies, those are killer lies.  They're lies that show direct, personal guilt." (Tr., Vol. XVI, p. 56.); "Bear in mind, if it were even a little bit true, that's what he would have told Tony Fike when Fike asked him, what makes you think their throats are cut?  That's a killer lie.  That's an I've had seven years to think about it lie." (Tr., Vol. XVI, p. 58.); "Well, first of all, remember, and this is your best example of what a killer - - a killer lie." (Tr., Vol. XVI, p. 97.); and, "These aren't dope lies.  None of these are dope lies, these are killer lies." (Tr., Vol. XVI, p. 105.)

was a 'brutal amateur' at killing were not improper, but were fair comments and reasonable inferences based on the evidence presented." <u>Dodd</u>, 100 P.3d at 1041. Petitioner has not demonstrated this determination to be unreasonable. As the OCCA did not find the comments to be improper, a determination the comments did not undermine the fundamental fairness of Petitioner's trial is neither unreasonable nor contrary to clearly established federal law. Even erroneous and inappropriate comments by a prosecutor may not result in a fundamentally unfair trial. <u>See</u> <u>United States v. Young</u>, 470 U.S. 1, 16 (1985) (concluding that "the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice"). As to other instances raised by Petitioner, the OCCA stated:

> Appellant also makes several complaints characterizing the lead prosecutor's conduct as melodramatic in general, and in particular, sarcastic about Appellant's emotional demeanor during his testimony. While cross-examining Appellant, the prosecutor made a comment couched as a question when he asked, "This is hard when you're having to do it on the fly, isn't it?" This type of question, asked without any real expectation of an answer and only for the purpose of attacking the witness's credibility, is gratuitous and improper. However, it is not improper for a prosecutor to comment on reasonable inferences based on the defendant's demeanor, when the defendant offers himself as a witness. <u>Mitchell v. State</u>, 1994 OK CR 70, ¶ 46, 884 P.2d 1186, 1203, <u>cert. denied</u>, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995). The prosecutor's conduct was at times melodramatic, and his sidebar comments about the defendant's demeanor would have been better reserved for closing argument. The trial in this case was long and sometimes emotional. Counsel for both parties were experienced, prepared, and zealous advocates. That zeal may have overtaken them briefly at times. Appellant concedes in his brief that neither side was beyond reproach. We have considered the instances Appellant complains of carefully, in light of the entire record, and cannot say that this conduct, alone or in accumulation, affected the outcome of the trial. This proposition is denied.

Id.

Referring to a defendant's testimony as a lie or calling a defendant a liar is not per se prosecutorial misconduct:

> Although labeling a defendant a "liar" is often "unnecessary" and "unwarranted," United States v. Nichols, 21 F.3d 1016, 1019 (10th Cir. 1994), we have held that referring to testimony as a lie is not per se prosecutorial misconduct, United States v. Robinson, 978 F.2d 1554, 1567 (10th Cir. 1992). On the contrary, it is permissible for the prosecution to comment on the veracity of a defendant's story. United States v. Hernandez-Muniz, 170 F.3d 1007, 1012 (10th Cir. 1999). We have therefore rejected claims of prosecutorial misconduct where the prosecution referred to a defendant as a liar on account of irreconcilable discrepancies between the defendant's testimony and other evidence in the case. See id.; Nichols, 21 F.3d at 1019.

Bland v. Sirmons, 459 F.3d 999, 1025 (10th Cir. 2006).

Here, the prosecutor's comments of "killer lies" were comments on Petitioner's version of the events given during statements to the police and during his testimony. The prosecutor was describing discrepancies not only in the testimony itself, but also in the reasons Petitioner gave for the versions he told the police and of those in his testimony in court. Considering the complained of instances in their context, Petitioner has not demonstrated that the OCCA's determination was unreasonable.

K.      Statements on Exclusion of Defense Evidence.

Petitioner next claims statements made by the prosecutors in their first-stage closing argument that the defense did not have a reasonable theory of innocence capitalized on an evidentiary exclusion and amounted to prosecutorial misconduct. (Pet. at 91-92.) Prior to trial, the trial court excluded any evidence of a third-party perpetrator on the grounds that the

Petitioner could not satisfy the State's "overt-act" rule. (See Ground Two.) Petitioner contends arguing, with the knowledge of the evidentiary exclusion, that the defense did not have a reasonable theory of innocence constitutes prosecutorial misconduct.

At the conclusion of his closing argument, the prosecutor stated:

> What you all want Ms. Hammarsten to know when she gets up here, is let's cut to the chase, Ms. Hammarsten. What is the reasonable theory of innocence, not consistent with one item or two, but consistent with all of the evidence together showing that Rocky Eugene Dodd, the guy right here, is the one who had the motive, the opportunity, the capacity, and he's the one who did the killer stuff. What is the reasonable theory of innocence? That's, I believe, what you want Ms. Hammarsten to tell you right now.

(Tr., Vol. XVI, pp. 105-06.) Later, in the State's rebuttal closing, the prosecutor again questioned the defense for a reasonable theory of innocence.[30]

Petitioner raised this claim on direct appeal and it was rejected collectively with other claims of prosecutorial misconduct by the OCCA: "We have considered the instances Appellant complains of carefully, in light of the entire record, and cannot say that this conduct, alone or in accumulation, affected the outcome of the trial. This proposition is denied." Dodd, 100 P.3d at 1041. Petitioner has not demonstrated the determination by the OCCA was contrary to, or an unreasonable application of, clearly established federal law. Nor has the Petitioner demonstrated that the complained of argument deprived him of a fundamentally fair trial. While a prosecutor may not comment on a defendant's exercise of his Fifth Amendment rights, he "is otherwise free to comment on a defendant's failure to call

---

[30] "Now, Mr. Wintory has gone over the element and the law, if you will, that we heard very little about the law from the Defense, but when you look at the law and think about some of the issues that were raised by the Defense and kind of put them together, you still have no reasonable theories of innocence." (Tr., Vol. XVI, p. 165.)

certain witnesses or present certain testimony." <u>Matthews v. Workman</u>, 577 F.3d 1175, 1188

(10th Cir. 2009) (quoting <u>Trice v. Ward</u>, 196 F.3d 1151, 1167 (10th Cir.1999)).  As discussed

in Ground 2, <u>supra</u>, it was not error to exclude evidence of a third-party perpetrator under the

State's overt-act rule.  When considered in context, referring to the defense's lack of a theory

of innocence was a comment on the evidence presented at trial and an argument that another

reasonable explanation, other than Petitioner as the killer, did not exist.  Petitioner has not

demonstrated these two comments so infected his trial as to deny him due process of law.

     L.      Opinion Regarding Appropriate Penalty.

Petitioner claims the prosecutor "improperly expressed his personal opinion that Mr.

Dodd should pay with his life; death was the only appropriate sentence; there was only one

choice; and imposition of a death sentence was 'the law,' 'justice,' and 'their duty' Tr. XVIII

12, 25, 37, 54." (Pet. at 92.)

This sub-claim was raised on direct appeal and denied by the OCCA:

> The prosecutor's claims that death was the only appropriate sentence were not
> met with an objection, and we find nothing improper about them.  Throughout
> closing, the prosecutor pointed to evidence to support his claim that a death
> sentence was the only "reasoned moral response," echoing language used by
> the Supreme Court.  <u>See</u> <u>Payne</u>, 501 U.S. at 836, 111 S.Ct. at 2614 (citations
> omitted).  Similarly, the prosecutor's discussion of how mitigating evidence
> should be evaluated was a fair characterization of the law.  <u>Slaughter</u>, 1997 OK
> CR 78, ¶¶ 79-80, 950 P.2d at 861 (plurality opinion).  There was no error here.

<u>Dodd</u>, 100 P.3d at 1044.

A prosecutor is permitted to argue under the facts and law that death is the appropriate

punishment:

A prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant. See Buchanan v. Angelone, 522 U.S. 269, 279, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) (stating that "the extensive arguments of both defense counsel and the prosecutor on the mitigating evidence and the effect it should be given in the sentencing determination" indicated that the jury had considered that evidence); see also Walker, 228 F.3d at 1243 ("[A] prosecutor is permitted to comment upon and to argue the appropriate weight to be given mitigating factors.") Fox v. Ward, 200 F.3d 1286, 1300 (10th Cir.2000) (rejecting an allegation of misconduct when "the prosecutor merely commented on the weight that should be accorded to the mitigating factors" and "did not suggest that the jury was not permitted to consider the factors").

Malicoat v Mullin, 426 F.3d 1241, 1257 (10th Cir. 2005); see also Neill v. Gibson, 278 F.3d 1044, 1058 (10th Cir. 2001) (not improper for prosecutor to address mitigation factors and argue none of them justified a sentence less than death); Thornburg v. Mullin, 422 F.3d 1113, 1135 (10th Cir. 2005) (citation omitted) (prosecutor is entitled to argue that under facts and law capital punishment is appropriate).

Review of the contested comments identified by Petitioner reveal that the prosecutor was not expressing his personal view, but rather was arguing that under the facts of the case death was the appropriate punishment. The prosecutor's comments did not suggest anyone other than the jury was the final or true arbiter of the appropriate punishment, nor did the comments mislead the jury about possible punishment alternatives, suggesting Petitioner could be released from jail if not sentenced to death. The prosecutor's comments were appropriate argument based on the facts presented at trial. Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

M.    Argument Regarding Petitioner's Background.

Petitioner next claims the prosecutor knowingly misstated facts in the State's second stage closing argument and falsely argued he should be executed because he had many chances in life.  Petitioner argues the prosecutor's statements "This is not some sociopath who didn't have an opportunity" and "This is not some guy with no education, no family, no choices in life, in and out of a cruel system that wouldn't give him a break" amount to misconduct because the prosecutor had access to the court files from Petitioner's first trial, and knew testimony was presented there that Petitioner had an "abnormal, chaotic and abusive family background."  (Pet. at 93-94)(quoting Tr., Vol. XVIII, pp. 20-21, 25.)[31]

This specific claim of prosecutorial misconduct was not raised until Petitioner's second application for post-conviction relief and was deemed procedurally defaulted by the OCCA.  Petitioner has not demonstrated the exceptions of cause and prejudice, or a miscarriage of justice, to support that this issue is not procedurally barred from this Court's review.  As discussed in Ground 4, supra, this Court finds Oklahoma's procedural bar applied to this claim brought for the first time in the Second Application for Post Conviction Relief to be independent and adequate.  Accordingly, the instant sub-claim is procedurally barred from habeas review.

N.    Conclusion.

When considered together, multiple alleged claims of prosecutorial misconduct may

---

[31] Evidence of this nature was not presented in the second stage of Petitioner's second trial.  In fact, the defense presented evidence tending to show the contrary – that Petitioner was raised to know the difference between right and wrong. (Tr., Vol. XVII, pp. 79, 80-81.)

appear to unfairly and impermissibly permeate a trial. Here, however, consideration of the accusations, together with an examination of the entire proceedings and the strength of the evidence presented against Petitioner, <u>Donnelly</u>, 416 U.S. at 645, demonstrate that the prosecutor's alleged improper remarks did not so infect the trial with unfairness as to deny Petitioner due process. Additionally, as to those claims raised in State court and addressed by the OCCA, Petitioner has failed to demonstrate the State court's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's fifth ground for relief is denied.

<u>Ground 6:</u>     <u>Absence From Various Stages of Proceedings</u>.

Petitioner claims his Constitutional rights to be present at all critical stages of his trial were violated in several instances without an express personal waiver. (Pet. at 96-100.) Specifically, he asserts he was not present at the following: (1) the in-chambers meeting between counsel and the court regarding victim impact statements; (2) during that same meeting, he was not present when a note from jury was sent to the court inquiring which window of the apartment was found unlocked; (3) the hearing on State's motion to compel Defendant to Submit to Tests (Motion Hearing, 10/18/00, pp. 1-21); (4) the hearing on Defendant's Notice of Conflict and Motion for Continuance (Motion Hearing, 11/30/00, pp. 1-18); and several status conferences regarding pending DNA testing (Motion Hearings, 12/29/00, pp. 1-18; 1/2/01, pp. 1-6; 2/22/01, pp. 1-7). Respondent responds first that Petitioner failed to raise his claim in State court regarding the jury note and that it is therefore procedurally barred from habeas review. (Resp. at 145-46.) As to the remaining claims,

Respondent responds that the OCCA's determination was not unreasonable in light of clearly

established Supreme Court precedent.

The OCCA held:

> In Proposition 19, Appellant claims he was denied his right to be present at all critical stages of the trial proceedings. To support this claim, he points to various pretrial motion hearings and status conferences, and to one in camera hearing during trial, where he was not physically present. At some of these hearings, Appellant's trial counsel purported to waive the necessity of his appearance. Appellant claims the record is insufficient to show that he personally waived his right to be present at these hearings.

> The "right to be present" that Appellant claims was violated is rooted primarily in the defendant's Sixth Amendment right to confront the witnesses against him. The Fifth Amendment right to due process may also be implicated, if Appellant's absence from some portion of the proceedings is shown to have impaired his ability to defend himself. See United States v. Gagnon, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); Snyder v. Massachusetts, 291 U.S. 97, 105-106, 54 S.Ct. 330, 332, 333, 78 L.Ed. 674 (1934). The defendant's right to be present "at the trial" is also protected by statute. 22 O.S.2001, § 583; Ryder v. State, 2004 OK CR 2, ¶ 29, 83 P.3d 856, 864; Perry v. State, 1995 OK CR 20, ¶ 25, 893 P.2d 521, 527-28. The specific constitutional sources of this "right to be present" reveal its limitations. An accused does not have an absolute constitutional right to be present at every in camera discussion between court and counsel, even during the trial itself. Davis v. State, 1988 OK CR 153, ¶ 12, 759 P.2d 1033, 1036. Nor does the statutory right to be present "at the trial" extend to in camera hearings or other matters outside the jury's presence. Reid v. State, 1970 OK CR 149, 478 P.2d 988, 999-1000, modified 507 P.2d 915.

> All of the hearings Appellant refers to, save one, occurred before trial. Most of these were nothing more than status conferences between the court and counsel. Two dealt with purely legal issues where no testimony was taken. At the one hearing Appellant complains of which occurred during trial, the court and counsel reviewed proposed second-stage evidence outside the jury's presence. Appellant was never denied his right to confront witnesses. He was present during all proceedings before the jury. He does not allege, much less demonstrate, that his ability to defend himself was in any way compromised by his absence at these proceedings. See Reid, id. (no error

where defendant's presence at in camera hearing was not essential to a fair and just determination of the matters discussed). This proposition is denied.

Dodd, 100 P.3d at 1027-28 (footnotes omitted).

A defendant has a constitutional right to be present at trial proceedings whenever his presence has a reasonably substantial relation to the fullness of his opportunity to defend against the charge. Kentucky v. Stincer, 482 U.S. 730 (1987) (Defendant's rights under the Confrontation Clause of the Sixth Amendment were not violated by his exclusion from a hearing to determine the competency of two child witnesses); United States v. Gagnon, 470 U.S. 522, 526 (1985) (Due Process rights not violated by defendant's absence during in camera discussion between trial judge and juror). A defendant's presence at proceedings "is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Gagnon, 470 U.S. at 526 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)).

Petitioner's trial counsel was present at all of the pre-trial hearings. A defendant's presence, however, is not required at a conference or hearing at which he could do nothing, such as a hearing on a motion that concerns only matters of law. Id. at 527. In the instant case, the discussions and arguments at the pre-trial hearings were based solely on case law or were status conferences to update the court on pending DNA testing. Under such circumstances, Petitioner would have gained nothing by attending. His presence was not required for a fair hearing and he was not denied due process. Id.

As to the one hearing during trial regarding victim impact statements, Petitioner has

not demonstrated his presence had a reasonably substantial relation to the fullness of his opportunity to defend against the charge. As recognized by the OCCA, he was not deprived of his right to confront the witnesses. Petitioner's only claim in regard to a possibility of prejudice from his absence is the assertion that he knew the victims and that he could have been helpful in addressing the issues of the hearing. He also includes a brief footnoted assertion that had he attended he might have demanded more mitigation witnesses and a greater quantum of mitigation evidence.[32] Petitioner does not now, however, even with the benefit of hindsight, detail or demonstrate what additional evidence, if any, he may have insisted on presenting that would have been relevant or responsive. Petitioner's absence did not result in an unfair or unjust hearing as his presence would have served no useful purpose and any benefit would have been but a "shadow." Snyder, 291 U.S. at 106-08. Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner last claims his absence during an off-the-record discussion regarding a note sent out by the jury prejudiced him, as he would have "strongly urged" the trial court to respond with an answer to the question instead of a non-committal response. Respondent responds the claim is unexhausted and procedurally barred. Alternatively, Respondent asserts that Petitioner has failed to cite to any clearly established Supreme Court precedent

---

[32] During the conference regarding the victim impact testimony, counsel and the trial court conveyed that they were working primarily off of transcripts of the victim impact statements from Petitioner's first trial and copies of statements previously provided to defense counsel when arguing what testimony would be proper under the law. (Tr., Vol. XVI, pp. 192-215.) Petitioner would not have gained any additional knowledge regarding the proposed victim impact testimony by attending the conference between the court and the attorneys.

entitling him to a particular answer to the jury note, and that he has failed to demonstrate that the trial court's response so infected the trial that the resulting conviction violated due process.

As to Respondent's assertion that the claim is unexhausted, the Court chooses not to enter this "procedural swamp" and, instead, exercise its discretion to bypass complex issues of exhaustion to reject the claim on the merits. Hooks v. Workman, 606 F.3d 715, 729 n.10 (10th Cir. 2010) (citing Revilla v. Gibson, 283 F.3d 1203, 1211 (10th Cir.2002)). This is an especially appropriate course, as this claim "may be disposed of in straightforward fashion on substantive grounds." Id.

During the in-chambers discussion between counsel and the trial court regarding the proposed victim impact statements (Tr., Vol. XVI, p. 191), the jury sent a note to which the trial court responded:

QUESTION: "Of the 2 windows to right of the door (Apt. 11), which window was found unlocked. Closest to door (#11) or (#10)"

ANSWER:    You have all the law & evidence which is proper to consider

(O.R., Court Exhibit No. 4.)

Petitioner claims the jury's question should have been answered due to the importance placed by the prosecution on the inference Petitioner had "monkeyed" with the window often used to gain access into the apartment and on the inference he had altered the crime scene. In support, Petitioner relies on United States v. Gomez, 67 F.3d 1515, 1527-28 (10th Cir. 1995). In Gomez, both defendant and his counsel were absent when the trial court, after

discussing the questions with the Assistant United States Attorney, responded to a note sent by the jury asking several factual and legal questions.[33] The Tenth Circuit recognized that a criminal defendant has a right under the Constitution to be present at any stage of a criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the proceeding. That right is further protected by Fed. R. Crim. P. 43(a). Id. at 1528. Even though a defendant has a right to be present when the trial court responds to a jury question, a deprivation of that right is still subject to harmless error analysis. Id.

In the instant case, although Petitioner was not present when the jury sent out a note and the trial court subsequently responded, he has not demonstrated any possible deprivation of a right that was critical to the outcome of his trial or that resulted in an unfair proceeding.

---

[33] The jury note read:

1. Cocaine brick—was it in a brown paper bag @ time of drug deal.
2. Information on truck bed
3. Would wife testify for Lupe Gomez
4. Layton
Judges Instructions
More Juice

Gomez at 1527. The trial court responded:

Dear Jurors:
This is in response to your questions using your same numbers:
1. It was not in the same brown paper bag at the time of the transaction.
2. As to the truck bed, I must ask you to base your decision on the evidence already presented to you on this subject at trial. The rules do not permit additional evidence at this time.
3. The same rule as stated in # 2 above applies here. Please do not consider whether the wife would or would not testify. Please base your verdict on the evidence and the law presented at trial.
4. I am sorry but I don't understand what you are asking on this question # 4 or your reference to "Judges Instructions." Please clarify if you wish further information.
David K. Winder
P.S. Please return these to the clerk at end of your deliberations.
Id.

"A finding of constitutional error does not turn on what a criminal defendant prefers; it turns on a determination that a mistake has been made which fundamentally affects the fairness of the proceeding." Id. at 1530. Petitioner has not demonstrated the trial court's response referring the jury's consideration to the law and evidence presented at trial was improper. Even were the response improper, Petitioner has failed to demonstrate that the trial court's error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

For the foregoing reasons, Petitioner's sixth ground for relief is denied in its entirety.

Ground 7:     Judicial Bias.

Petitioner claims it is evident from the record the trial judge showed partiality toward the prosecutor and hostility toward the defense throughout the course of the trial in violation of his basic due process right to a fair trial in a fair tribunal. Petitioner asserted a claim with the OCCA for post-conviction relief that appellate counsel was ineffective for failing to raise a claim of judicial bias on appeal. Respondent recognizes that claim is exhausted and responds that Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.

In support of his claim, Petitioner identifies and sets forth the following: (1) multiple instances of rulings by the trial court, apparent from the record, which he considers unfavorable; (2) an instance of a sanction by the trial court against his trial counsel; and, (3) argument that the trial judge allowed the prosecutor overly wide latitude in contrast to that allowed to defense counsel. He further argues that because the issue was "preserved on the

record," appellate counsel was ineffective for failing to raise a distinct claim of judicial bias on direct appeal. (Pet. at 100-04.)

The OCCA considered and denied Petitioner's claim on post-conviction review:

> Petitioner raises two related propositions of error. First, he claims that both trial and appellate counsel rendered ineffective assistance by failing to argue that judicial bias has so infected the trial proceedings as to deny Petitioner his constitutional right to a fair trial. Second, Petitioner argues that even if the effects of judicial bias, standing alone, did not deny him a fair trial, the combined effect of the bias, and the other errors raised on direct appeal, did.
>
> To support the underlying claim of judicial bias, Petitioner refers to several instances of alleged prosecutor misconduct during his trial, to the admission or exclusion of certain types of evidence, and to certain bench conferences between the court and counsel. Petitioner argues that by denying various objections made by defense counsel, failing to enforce its rulings *in limine,* or failing to take remedial action *sua sponte*, the trial court exhibited favoritism toward the prosecution. Petitioner also points to the court's imposition of monetary sanctions on his defense counsel as further evidence that the court was biased against him.

Dodd, No. PCD-2002-625, slip op. at 2-3.

The OCCA determined Petitioner's claim to be based on conduct during trial and easily identified by reference to the appeal record at the time the direct appeal was filed.[34] The State court then considered whether any competent counsel would have failed to raise the claim of judicial bias, employing the "clearly established" guidelines of Strickland v. Washington, 466 U.S. 668 (1984). After setting forth the Strickland standard and the law necessary to establish a claim of judicial bias, Dodd, slip op. at 4-5, the OCCA held:

---

[34] "Indeed, virtually all of the incidents were raised by counsel on direct appeal in only slightly different contexts." Id., slip op. at 3.

As noted above, virtually all of the instances Petitioner lists as evidence of judicial bias were identified and raised by counsel on direct appeal as substantive errors, *e.g.,* evidentiary error and prosecutor misconduct. The fact that appellate counsel could have presented the same facts in a slightly different way does not render counsel's performance deficient. See Bland v. State, 2000 OK CR 11, ¶ 122, 4 P.3d 702, 732, cert. denied, 531 U.S. 1099, 121 S.Ct. 832, 148 L.Ed.2d 714 (2001). Appellate counsel's decision to characterize Petitioner's complaints as discrete errors rather than judicial bias, was a "virtually unchallengeable" strategic choice. Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066. Whatever is advanced as the *cause* of these perceived trial errors - judicial inadvertence, mistake, or even bias against the accused - ultimately our analysis is the same. This Court looks to whether error occurred, either in the evidence the jury was permitted to hear or in the law it was required to follow; and even if error did occur, whether that error prejudiced the defense.

In Petitioner's direct appeal, we found no error which, individually or cumulatively, denied him a fair trial. This absence of prejudice means that Petitioner's instant claim of ineffective assistance of counsel, for failing to cast arguments in terms of judicial bias, must fail as well. Petitioner has failed to demonstrate that any perceived bias on the trial court's part affected the outcome of his trial. Consequently, Petitioner has failed to demonstrate that he is entitled to post-conviction relief. 22 O.S.Supp.2004, § 1080(C); Fields v. State, 1996 OK CR 35, ¶ 64, 923 P.2d 624, 636, cert. denied, 520 U.S. 1216, 117 S.Ct. 1704, 137 L.Ed.2d 829 (1997); Thomas v. State, 1994 OK CR 85, ¶ 8, 888 P.2d 522, 526, cert. denied, 516 U.S. 840, 116 S.Ct. 123, 133 L.Ed.2d 73 (1995); Hatch v. State, 1983 OK CR 47, ¶¶ 7-9, 662 P.2d 1377, 1380-81, cert. denied, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986).

Id., slip op.at 5-6 (footnote omitted).

When considering an ineffective assistance of appellate counsel claim, the Court applies the same test as that used in evaluating a claim of ineffective assistance of trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000). Petitioner's ineffective assistance of appellate counsel claim is governed by Strickland v. Washington, 466 U.S. 668 (1984). To establish constitutionally ineffective assistance of counsel, Petitioner must show both that his

counsel's performance was deficient and that the deficient performance prejudiced his defense. See id. at 687. "In order to evaluate appellate counsel's performance, 'we look to the merits of the omitted issue.'" Miller v. Mullin, 354 F.3d 1288, 1298 (10th Cir.2004) (quoting Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003)).

When considering an ineffective assistance of counsel claim previously addressed by a State court, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. Harrington v. Richter, 131 S.Ct. 770, 785 (2011). "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 788.

Here, Petitioner has not demonstrated that the OCCA's determination was unreasonable. The OCCA found that the underlying instances at trial of alleged error offered to demonstrate judicial bias, and ineffective assistance of appellate counsel for failing to raise the judicial bias claim, were without error and neither individually nor cumulatively denied Petitioner a fair trial. The State court determined that this absence of prejudice resulted in the failure of his ineffective assistance of counsel claim. "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 787 (quoting Strickland, 466 U.S. at 694).

Apparently, in an attempt to demonstrate unreasonableness and to show judicial bias, Petitioner relies on Mitchell v. State, 136 P.3d 671 (Okla. Crim. App. 2006), arguing a case of judicial bias in Oklahoma County "is not without recent precedent." (Pet. at 103.) Petitioner's reliance is misplaced. Mitchell is a State court opinion decided over two years after the OCCA's decision on Petitioner's appeal and over one year after the OCCA's decision on his post-conviction application.[35] Although it did involve the same assistant district attorney as prosecutor and was tried in the same county, the similarities end there. Defense counsel and the trial judge differed from those in Petitioner's trial. The OCCA found errors in Mitchell where it found none in Petitioner's case. Despite the above favorable and unfavorable comparisons, however, most important for this Court's review is Petitioner's failure to demonstrate either ineffective assistance of appellate counsel or that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Petitioner's seventh claim for relief is denied.

Ground 8:     Victim Impact Evidence.

_____

[35] In Mitchell, the OCCA found that the prosecutor committed serious and potentially prejudicial misconduct and that, under those specific circumstances, the trial court's failure to condemn or ameliorate the misconduct could be considered as the court determined the appropriate remedy for the numerous other errors in the case. Mitchell, 136 P.3d at 710-11.

Petitioner claims that each of the seven victim impact witnesses who, in addition to reading prepared statements, expressed their opinion that death was the appropriate sentence violated his Sixth, Eighth and Fourteenth Amendment rights and the clearly established Supreme Court precedent of <u>Booth v. Maryland</u>, 482 U.S. 496 (1987), and <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). (Pet. at 104-11.) Respondent responds that even though the OCCA rejected Petitioner's claim under <u>Payne</u>, it conducted an alternative analysis and found any error harmless beyond a reasonable doubt. (Resp. at 160-70.)

In the second stage of Petitioner's trial, the trial court allowed seven witnesses to testify who expressed their opinions that death was the appropriate sentence. On appeal, the OCCA refused to reconsider its position that witnesses giving a short, straight-forward recommendation for the imposition of the death penalty was statutorily permitted. Alternatively, however, the OCCA considered the impact of the opinion testimony and held:

> Even assuming there is any question as to the propriety of the victim impact evidence, to determine unfair prejudice, we look to the strength of the State's case in aggravation and whether the trial court properly instructed the jury on the use of victim impact evidence. <u>Welch</u>, 2000 OK CR 8, ¶ 42, 2 P.3d at 373. As we have already observed, the aggravating circumstances found by the jury were established overwhelmingly in the guilt phase of trial - one by the nature of the double murder itself, the other by Appellant's admission to a past crime of violence. The jury clearly paid close attention to the law as it applied to the facts, because it rejected two other aggravating circumstances alleged by the State. Appellant does not claim, and we do not find, any impropriety in the trial court's victim impact instructions. We also note that from the circumstances surrounding the crime itself, presented in the guilt phase and incorporated into the punishment phase, the jury was well aware of the victims' involvement with illegal drugs. The jury was thus presented with a well-balanced sketch of the victims' lives. We cannot say the victim impact evidence distracted the jury from rendering punishment out of a "reasoned, moral response" to the crimes. <u>Williams v. State</u>, 2001 OK CR 9, ¶ 62, 22 P.3d

702, 719, <u>cert. denied</u>, 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002). Therefore, any minor impropriety in the victim impact testimony was harmless beyond a reasonable doubt. <u>Chapman</u>, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This proposition is denied.

<u>Dodd</u>, 100 P.3d at 1046-47.

In <u>Hooper v. Mullins</u>, 314 F.3d 1162 (10th Cir. 2002), the Tenth Circuit considered an identical claim where the trial court permitted three members of the victim's family to testify they believed the defendant deserved to die. The OCCA, as it has here, concluded the trial court properly admitted the testimony. Despite that determination, the Tenth Circuit agreed with the petitioner that the OCCA's determination was contrary to clearly established Supreme Court precedent:

> The Supreme Court has held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." <u>Payne v. Tennessee</u>, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In so holding, the Court overruled its earlier decisions in <u>Booth v. Maryland</u>, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and <u>South Carolina v. Gathers</u>, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). <u>See</u> <u>Payne</u>, 501 U.S. at 811, 817, 830, 111 S.Ct. 2597. Nonetheless, we have recognized that " <u>Payne</u> left one significant portion of <u>Booth</u> untouched. . . . [T]he portion of <u>Booth</u> prohibiting family members of a victim from stating 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' during the penalty phase of a capital trial survived the holding in <u>Payne</u> and remains valid.' " <u>Hain</u>, 287 F.3d at 1238-39 (<u>quoting</u> <u>Payne</u>, 501 U.S. at 830 n. 2, 111 S.Ct. 2597). Therefore, the trial court erred by admitting this victim-impact testimony during Petitioner's capital sentencing proceeding. <u>See id.</u> at 1239. Nonetheless, this constitutional error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637, 113 S.Ct. 1710 (further quotation omitted); <u>see also</u> <u>Willingham</u>, 296 F.3d at 931 (applying <u>Brecht</u>'s harmless-error analysis to similar claim).

> <u>Payne</u> also provides that victim-impact evidence that is "so unduly

prejudicial that it renders the trial fundamentally unfair" deprives a capital defendant of due process. 501 U.S. at 825, 111 S.Ct. 2597. Because the victim-impact evidence did not have that effect here, however, the OCCA reasonably denied Petitioner relief on this due-process claim. See Willingham, 296 F.3d at 931; United States v. Chanthadara, 230 F.3d 1237, 1273-74 (10th Cir. 2000).

Hooper, 314 F.3d at 1174.

Contrary to the OCCA's determination, it was error in respect to Booth and Payne, for the witnesses to give their opinion of an appropriate sentence. This error alone, however, will not provide habeas relief unless it can be determined by this Court that the error was not harmless. Before a harmless error analysis can be undertaken, it must first be determined what type of error occurred – "trial error" or "structural" error. Here, the error complained of by Petitioner is "trial error" and a harmless error analysis is proper:

> Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]". . . . At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards". . . . The existence of such defects - - deprivation of the right to counsel, for example - - requires automatic reversal of the conviction because they infect the entire trial process.

Brecht v. Abrahamson, 507 U.S. 619, 629-30 (1993) (citations and footnote omitted).[36]

Petitioner argues the OCCA did not determine the witnesses' opinions recommending

---

[36] The Court's decision that this error is "trial error," not requiring automatic reversal, is supported by the list of sixteen cases set forth by the Supreme Court in Arizona v. Fulimante, 499 U.S. 279, 306-308 (1991), detailing a wide range of errors to which harmless error analysis has been applied. Cases in which constitutional rights were so basic as to preclude harmless error include: Payne v. Arkansas, 356 U.S. 560 (1958) (coerced confession); Gideon v. Wainwright, 372 U.S. 335 (1963) (right to counsel); and Tumey v. Ohio, 273 U.S. 510 (1927) (impartial judge).

the death sentence to be error. Instead, Petitioner argues, the harmless error review pertained to several preceding paragraphs of discussion of various arguable errors in the victim impact submissions. (Reply at 81-82.) Whether or not the OCCA's harmlessness review pertained to the victim impact opinion testimony, admission of such testimony was error and this Court must assess the prejudicial impact of the error under the "substantial and injurious effect" standard as part of harmless error analysis as set forth in <u>Brecht</u>. <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007).

In <u>Brecht</u>, the Supreme Court held that an error is harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" <u>Brecht</u>, 507 U.S. at 631(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). Here, the witnesses' opinions regarding sentencing did not have a substantial and injurious effect on the jury's determination to recommend death as the appropriate sentence. Far from dominating their statements, each witness's assertion that the death penalty would be appropriate was short and concise, and substantially free from language that could be characterized as beseeching the jury to impose a death sentence. By comparison, the victim impact statements regarding the death penalty here were significantly milder than those in <u>Welch v. Workman</u>, 639 F.3d 980 (10th Cir. 2011), which the Tenth Circuit found did not result in actual prejudice. Although improper, it is doubtful the witnesses' concisely stated opinions had much inflammatory impact compared to the horrific nature of the murders and the strength of the State's evidence of Petitioner's prior felony involving the use of violence. The trial court judge, reviewing the proceedings as they occurred, expressed in response to a defense

objection her view that the nature of the testimony and the atmosphere in the courtroom were not emotionally overwhelming to the jury, and would not interfere with the jury's rendition of a reasoned decision based on the law and evidence. (Tr., Vol. XVII, p. 65.)  This Court does not take issue with that assessment, or with the OCCA's treatment of this issue.

Petitioner further argues other "questionable or improper parts of the victim impact presentation" occurred and were considered harmless by the OCCA.  Petitioner claims the OCCA's harmless error determination did not include the sentence recommendations. (Pet. at 108-9.)  Petitioner presented on appeal multiple instances of alleged error regarding the victim impact statements.  The OCCA thoroughly considered each claim and either found no error or determined the error to be harmless. Dodd, 100 P.3d at 1044-46.  Any errors determined by the OCCA were errors of State law for which habeas relief does not lie. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  A comprehensive review of the State court opinion convinces this Court that the OCCA's harmless error review quoted above incorporated both the State court errors in the victim impact statements and the sentencing opinions of those witnesses.  Considered collectively, and for substantially the same reasons delineated by the OCCA, the Court is not convinced the errors had a substantial or injurious effect on the jury's sentencing determination, and, therefore, finds that such errors were harmless.  Petitioner's eighth ground for relief is denied.

Ground 9:    Life Without Possibility of Parole Jury Instructions.

Petitioner claims the trial court erred when it failed to give a clarifying instruction regarding the meaning or effect of the sentence of life without the possibility of parole.  He

contends the OCCA's determination focused its attention on his argument that he should be allowed to present evidence on the mechanics of Oklahoma's parole system rather than "squarely on the life without parole confusion problem." (Pet. at 111-117.)

On appeal, Petitioner raised a number of issues regarding which he conceded the OCCA had previously rejected. The OCCA determined Petitioner had offered no convincing reasons why the court should reverse its positions on those issues and it declined to so do. In a footnote, the OCCA identified Petitioner's claim stating: "The trial court did not err in declining to instruct the jury to presume that any sentence it imposed would be carried out." Dodd, 100 P.3d at 1049 & n.13.[37]

"In Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), this Court held that where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without the possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by jury instruction or in arguments by counsel.'" Shafer v. South Carolina, 532 U.S. 36, 39 (2001) (quoting Ramdass v. Angelone, 530 U.S. 156, 165 (2000)). In both Simmons and Shafer, the jury was only given two sentencing options, creating a false choice of either sentencing the petitioners to death or sentencing them to a limited period of incarceration. Simmons, 512 U.S. at 161; Shafer, 532 U.S. at 41.

---

[37] Petitioner acknowledges that it is the law of this circuit that the jury instruction setting forth the sentencing options convey on its own the meaning of life without the possibility of parole. (Reply at 87) (citing Hamilton v. Mullin, 436 F.3d 1181, 1191 (10th Cir. 2006), and Mayes v. Gibson, 210 F.3d 1284, 1294 (10th Cir. 2000)).

In Mayes v. Gibson, 210 F.3d 1284 (10th Cir. 2000), the Tenth Circuit was presented with an issue identical to Petitioner's instant claim. In Mayes, the trial court had instructed the jury to choose between life imprisonment, life imprisonment without the possibility of parole, and death. The Tenth Circuit concluded the "three-way choice fulfills the Simmons requirement that a jury be notified if the defendant is parole ineligible," and denied relief. Id. at 1294; see also McCracken v. Gibson, 268 F.3d 970, 980-81 (10th Cir. 2001).

Subsequent to Mayes, the Tenth Circuit was presented with the argument that the Supreme Court's decision in Shafer undermined its prior determination in Mayes. Smith v. Mullin, 379 F.3d 919 (10th Cir. 2004). The Tenth Circuit held:

> Given the two-way choice in Shafer, and the clear evidence of jury confusion, that case is distinguishable from our decision in Mayes. Because Mr. Smith's case is identical to Mayes and suffers none of Shafer's identified short-comings, Mr. Smith is not entitled to relief from his sentence on these grounds.

Smith, 379 F.3d at 938.

Most recently, in Welch v. Workman, 639 F.3d 980, (10th Cir. 2011), the Tenth Circuit considered an issue on habeas review regarding two notes from the jury requesting clarification of the meaning of the life without possibility of parole sentencing option. The trial court responded both times that it was not allowed to answer the jury's question. In denying relief, the Tenth Circuit stated:

> Even assuming the trial court's statement (that it was not allowed to answer the jury's questions) ran afoul of Oklahoma procedural law, its response simply could not have created a prohibited false choice under the United States Constitution. Failing to clarify the life without parole instruction cannot be "taken to mean that parole was available but that the jury, for some

unstated reason, should be blind to this fact." Shafer, 532 U.S. at 53, 121 S.Ct. 1263 (quotation marks omitted). Rather, as in McCracken and McGregor, the state trial court's non-responsive answer simply required the jury to return to the instructions as its sole guidance. And those instructions properly referred to Oklahoma's three-option sentencing scheme, offering the jury three choices—death, life imprisonment without parole and life imprisonment—which we have previously held to be constitutionally adequate. Hamilton v. Mullin, 436 F.3d 1181, 1191 (10th Cir. 2006).

Id. at 1005.

The Tenth Circuit's precedent precludes the instant claim. Petitioner does not make any argument which compels or permits this Court to disregard this binding precedent. See United States v. Foster, 104 F.3d 1228 (10th Cir. 1997). Additionally, Petitioner has failed to demonstrate that the OCCA's resolution of this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. §2254(d)(1). Accordingly, this ground for relief is denied.

Ground 10:    Aggravating Circumstances.

Petitioner next claims a defendant cannot be sentenced to death unless the jury finds an aggravating circumstance beyond a reasonable doubt and the jury determines aggravation outweighs mitigation, and that it was error that the jury was not instructed it must find *beyond a reasonable doubt* that aggravation outweighed mitigation before considering the penalty of death. He claims such omission violated his rights under the Sixth, Eighth, and Fourteenth Amendments, and is contrary to Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002).

(Pet. at 117-24.)  Respondent responds that Petitioner's claim is unexhausted and, therefore, procedurally barred. (Resp. at 172-78.)[38]

The Supreme Court in <u>Jones</u> construed a federal carjacking statute to determine whether it defined three distinct offenses or a single crime with a choice of three maximum penalties – two of which were exempt from the requirements of charge and jury verdict. <u>Jones</u>, 526 U.S. at 229.  The Supreme Court held that the statute established three separate offenses, and stated that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." <u>Id.</u> at 243, n.6.

Soon thereafter, the Supreme Court decided <u>Apprendi</u>.  In <u>Apprendi</u>, the defendant was convicted of second-degree possession of a firearm.  Under New Jersey law, that offense carried a maximum penalty of ten years imprisonment.  On the State's motion, the sentencing judge found by a preponderance of the evidence that the defendant's crime had been motivated by race, which under New Jersey law could enhance the defendant's sentence.  The Supreme Court held that the enhanced sentence violated the defendant's right to a jury determination that he was guilty of every element of the crime beyond a reasonable doubt.  <u>Apprendi</u>, 530 U.S. at 477.  Merely using the label of sentence enhancement did not provide a basis for treating the two acts differently: "If a State makes an increase in a defendant's

---

[38]  The Court need not address Respondent's argument that this claim is unexhausted as it may be denied on the merits.  28 U.S.C. § 2254(b)(2).

authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Id. at 482-83.

Thereafter, the Supreme Court considered an Arizona statute which, following a jury determination of guilt of first-degree murder, authorized the trial judge alone to determine the existence or absence of aggravating circumstances. The Supreme Court overruled a previous case upholding the State statute[39], and held that: "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' Apprendi, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury." Ring, 536 U.S. at 609. This determination was reaffirmed by the Supreme Court the following term:

> Just last Term we recognized the import of Apprendi in the context of capital-sentencing proceedings. In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), we held that aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a greater offense.' " Id., at 609, 122 S.Ct. 2428 (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death. Accordingly, we held that the Sixth Amendment requires that a jury, and not a judge, find the existence of any aggravating circumstances, and that they be found, not by a mere preponderance of the evidence, but beyond a reasonable doubt. Id., at 608-609, 122 S.Ct. 2428.

Sattazahn v. Pennsylvania, 537 U.S. 101, 111 (2003).

Petitioner's contention that "[t]here is no question the determination that aggravation

---

[39] Walton v. Arizona, 497 U.S. 639 (1990).

outweighs mitigation is a <u>factual</u> determination that increases the maximum authorized penalty under Oklahoma law" is contrary to the Supreme Court's description of what constitutes an "element" of a greater offense. (Pet. at 119)(emphasis added). <u>Ring</u> held that only aggravating circumstances that make a defendant eligible for the death penalty operate as the functional equivalent of an element of a greater offense. Contrary to classifying the weighing of the aggravating and mitigating circumstances as facts to be determined beyond a reasonable doubt, the Supreme Court has determined it to be a discretionary process by the jury:

> "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." <u>Ramos</u>, <u>supra</u>, 463 U.S., at 1008, 103 S.Ct., at 3457. Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." <u>Zant</u>, <u>supra</u>, 426 U.S., at 875, 103 S.Ct., at 2742; <u>see also</u> <u>Barclay v. Florida</u>, 463 U.S. 939, 948-951, 103 S.Ct. 3418, 3424-3425, 77 L.Ed.2d 1134 (1983) (plurality opinion).

<u>Tuilaepa v. California</u>, 512 U.S. 967, 979-80 (1994).

Petitioner's jury was instructed that it must find the existence of any aggravating circumstance beyond a reasonable doubt. The jury made the factual determination that Petitioner had previously been convicted of a felony involving the use or threat of violence, and that he knowingly created a great risk of death to more than one person. The jury's determination of the existence of those aggravating circumstances – the functional equivalent of an element of a greater offense – placed Petitioner in that class of persons eligible to receive the death penalty. All <u>Apprendi</u> and <u>Ring</u> require is that a jury, and not a judge,

determine the existence of aggravating circumstances beyond a reasonable doubt.

In Matthews v. Workman, 577 F.3d 1175 (10th Cir. 2009), the Tenth Circuit considered a claim identical to the one presented here and found the petitioner's Apprendi argument to be barred by its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir.2007):

> There, we explained that the jury's determination that aggravating factors outweigh mitigating factors is not a finding of fact subject to Apprendi but a "highly subjective, largely moral judgment regarding the punishment that a particular person deserves." Id. at 1107 (citing Caldwell v. Mississippi, 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)). We are of course bound by this decision as the law of the circuit.

Matthews, 577 F.3d at 1195.

Petitioner has failed to demonstrate that his Sixth, Eighth, and Fourteenth Amendment rights were violated by either Oklahoma's sentencing procedure and requirements or the jury's determination of the factual prerequisites necessary for an imposition of a sentence of death. Accordingly, Petitioner's tenth ground for relief is denied.

Ground 11:   Prior Violent Felony Aggravating Circumstance.

In his eleventh ground for relief, Petitioner claims his death sentence improperly relies in part on evidence he was guilty of a prior violent felony committed when he was under the age of eighteen. Additionally, he claims the admission of photographs of the prior assault was violative of the Eighth and Fourteenth Amendments. (Pet. at 124-27.)

In the second stage of trial, the State introduced evidence of Petitioner's prior felony conviction for an assault upon an elderly woman committed when he was sixteen years of

age.[40]  On appeal, the OCCA considered Petitioner's claim under State law and denied relief:

> Appellant contends that offenses committed while he was a juvenile should not be admissible to support the prior-violent-felony aggravator. However, as the State points out, Appellant was not a "juvenile" when he committed the armed robbery at sixteen years of age.  Given the seriousness of the offense, Appellant was, under Oklahoma law, charged and convicted as an adult, and he cannot avail himself of any public policy arguments against admission of juvenile adjudications.  While Appellant states that offenses committed when one is a juvenile "do not necessarily accurately predict one's actions as an adult," the jury in this case did not use Appellant's conduct as a sixteen-year-old to predict his future actions, as it did not find Appellant to be a "continuing threat to society."  Rather, the jury only considered the conduct as evidence of a particular historical fact-prior conviction for a violent felony offense - which, by law, renders one eligible for the death penalty. See Williams, 2001 OK CR 9, ¶ 100, 22 P.3d at 725 (noting different purposes between "continuing threat" and "prior violent felony" aggravators).

Dodd, 100 P.3d at 1047.

Before this Court, Petitioner claims the State court's determination was unreasonable under Roper v. Simmons, 543 U.S. 551 (2005), which held that individuals who commit murder when they are under eighteen years of age may not be sentenced to death.  Petitioner asserts the logic of Roper leads to the conclusion that the Constitution does not permit crimes committed while under the age of eighteen to form the basis for a sentence of death. Petitioner's reliance on Roper is misplaced.  First, the OCCA's decision was rendered on October 21, 2004 and Roper was decided March 1, 2005.  Accordingly, the OCCA's determination could not have been contrary to, or an unreasonable application of, the Supreme Court's bar against execution of individuals who committed murder before they

---

[40]  When Petitioner was sixteen years old, he beat and robbed a seventy-seven year-old woman in her home. He subsequently pled nolo contendre, certified as an adult, to robbery with a dangerous weapon. (Tr., Vol. XIV, pp. 88-100; Tr., Vol. XVII, pp. 22-33, 62-63.)

reached eighteen years of age. 28 U.S.C. § 2254(d).  More importantly, the issue in Roper

was whether "it is permissible under the Eighth and Fourteenth Amendments to the

Constitution of the United States to execute a juvenile offender who was older than 15 but

younger than 18 when he *committed a capital crime*." Id. at 555-56 (emphasis added).

Petitioner was twenty-seven  years old at the time of the murders. (Tr., Vol. XIII, p. 185.)

Despite these facts, Petitioner contends the policy considerations of Roper are equally

applicable when his death sentence is based in part on a prior violent felony committed when

he was under the age of eighteen.  The Supreme Court determined and concluded that due

to a juvenile offender's lack of maturity, vulnerability, and susceptibility to negative

influences, and less formed character than that of an adult, Roper, 543 U.S. at 569-70, neither

retribution nor deterrence provides adequate justification for imposing the death penalty on

juvenile offenders. Id. at 571.  Roper concerned a defendant who was seventeen when he

committed the crime but was convicted of committing first-degree murder and sentenced to

death after he turned eighteen.  As stated previously, Petitioner was twenty-seven years old

at the time of the murders.  Regarding whether juvenile offenses are applicable as sentence

enhancements in federal sentencing after Roper, the rationale of the Eleventh Circuit is

instructive:

> It is one thing to prohibit capital punishment for those under the age of
> eighteen, but an entirely different thing to prohibit consideration of prior
> youthful offenses when sentencing criminals who continue their illegal activity
> into adulthood.  Roper does not mandate that we wipe clean the records of
> every criminal on his or her eighteenth birthday.

U.S. v. Wilks, 464 F.3d 1240, 1243 (11th Cir. 2006).

Petitioner next cites in summary form to State Exhibits 198-203 as inflammatory photographic evidence admitted during the sentencing stage of an assault "which was unfortunately committed on an elderly woman," violative of his Eighth and Fourteenth Amendment rights. (Pet. at 124.)[41]  On appeal, the OCCA determined the exhibits were proper:

> Nor do we find any prejudice in the admission of testimony and photographs concerning the injuries sustained by the victim in the prior robbery offense. They shed more light on the circumstances of the offense much more than mere documentary evidence of a conviction. Specifically, they tended to show that the offense was not just potentially violent, but indisputably so. The State was entitled to present evidence beyond the Judgment and Sentence to establish the violent nature of the prior offense. Brewer v. State, 1982 OK CR 128, ¶¶ 35-43, 650 P.2d 54, 62, cert. denied, 459 U.S. 1150, 103 S.Ct. 794, 74 L.Ed.2d 999 (1983).

Dodd, 100 P.3d at 1047.

Spears v. Mullin, 343 F.3d 1215 (10th Cir. 2003), cited by Petitioner, is inapposite here.  In Spears, the Tenth Circuit found the introduction into evidence in the second stage of trial of multiple photographs of the victim's post-mortem stab wounds, large gash wounds, exposed intestines, and swollen face and black eye rendered the second stage of trial fundamentally unfair.  It determined that because the especially heinous, atrocious, or cruel aggravator focused on the victim's conscious suffering and that the evidence demonstrated

---

[41]  Petitioner's description of these exhibits is incorrect.  Only Exhibits 198-200 are photographs.  Exhibit 198 is a Polaroid photograph depicting the top of the elderly woman's head and her swollen, bruised hand.  Exhibit 199 depicts what appears to be the elderly woman's living room.  Exhibit 200 is a Polaroid photograph of the carpet and a "stick" apparently used in the attack.  The remaining referenced exhibits are not photographs.  Exhibit 201 is the Judgment and Sentence regarding Petitioner's case of robbery with a dangerous weapon.  Exhibit 202 is the Judgment and Sentence on Revocation of Suspended Sentence on the same case, and Exhibit 203 is the criminal docket.

the victim died or lost consciousness early in the beating, the photographs of all the injuries were unduly prejudicial and misled the jury. It added that even if the photographs were minimally relevant, their prejudical effect substantially outweighed their probative value. Id. at 1227-28. Here, the photographs were introduced to establish the nature of a past violent felony. Only one photograph depicted the victim's injuries, viz: a cut on the top of her head and a bruised and swollen hand. As determined by the OCCA, that photograph was relevant to show the attack was indisputably violent. The other crime scene photographs showed the weapon used in the attack and the disarray of the victim's home.

Petitioner has failed to demonstrate the OCCA's determination regarding the photographs was unreasonable. Nor has Petitioner demonstrated that admission in the second stage of trial of evidence of his prior violent felony, committed when he was sixteen years of age, is contrary to Supreme Court precedent. Accordingly, Petitioner's eleventh ground for relief is denied.

Ground 12:    Blood Evidence and Expert Testimony.

In his twelfth ground for relief, Petitioner claims that admission of bloodstain evidence, luminol testing, and related testimony should have been excluded under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), and that failure to exclude the inherently unreliable, irrelevant, and prejudicial evidence so infused his trial with unfairness as to deny him due process. (Pet. at 129-39.) Respondent responds that Petitioner's claim is little more than an attack on State evidentiary rulings, and that the OCCA adjudicated this claim on the merits, thus requiring this Court to give deference to the State court

determination under 28 U.S.C. § 2254(d). (Resp. at 186-96.)

The OCCA considered Petitioner's claim on appeal and denied relief. Although lengthy, the Court finds the OCCA's thorough analysis beneficial to include here in its entirety:

> In Proposition 4, Appellant complains that expert testimony regarding bloodstains found at the crime scene was improperly admitted. Douglas Perkins, a forensic specialist with the Oklahoma State Bureau of Investigation, testified about the results of luminol tests conducted at the crime scene, primarily in and around the bathroom sink. Perkins and forensic specialist Tom Bevel testified about a blood swipe found on the bottom of Keri Sloniker's right foot, and comparisons between its shape and the dimensions of Al Ames's hunting knife. Prior to trial, Appellant moved to exclude evidence regarding luminol testing, because of the limitations inherent in the procedure and perceived deficiencies in its use in this particular investigation. The trial court denied the motion. Appellant did not renew his objections when either Perkins or Bevel testified, so we review only for plain error. Simpson v. State, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693.

> Perkins testified to finding possible traces of diluted blood in the victims' bathroom sink. The presence or absence of blood in the sink was never conclusively determined. Perkins also testified that the blood swipe on Sloniker's foot was not inconsistent with the dimensions of Ames's hunting knife, but it was inconsistent with the shape of knives found in Appellant's apartment. The State's theory was that after murdering his victims, the perpetrator wiped blood off the murder weapon onto the bottom of Sloniker's foot, walked into the bathroom, and washed himself and/or the weapon at the sink. A hand towel from the victims' bathroom was found in the apartment complex dumpster, and a drop of blood on the towel was linked through DNA testing to Shane McInturff.

> Appellant claims Perkins' testimony should not have been admitted because luminol testing is unreliable, and therefore Perkins' opinions lacked foundation. We disagree. We have held that luminol testing, as a scientific procedure, is sufficiently reliable for what it purports to do: presumptively indicate the possible presence of blood. See Robedeaux v. State, 1993 OK CR 57, ¶ 22, 866 P.2d 417, 425, cert. denied, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994). Appellant mistakenly equates a presumptive, i.e.

inconclusive, scientific procedure with an unreliable, and therefore inadmissible, one. To be admissible, evidence need not be irrefutably conclusive of anything; it must only tend to make the existence of a particular fact of consequence more or less probable. 12 O.S.2001, § 2401. Regarding scientific or specialized knowledge, the relevant inquiry is whether the procedure used is reliable enough for its stated purpose, and whether the jury was misled as to the conclusions which could be drawn therefrom. See 12 O.S.2001, §§ 2403, 2702-05; Romano v. State, 1995 OK CR 74, ¶ 25, 909 P.2d 92, 110, cert. denied, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996) (improper opinion regarding blood-spatter evidence); McCarty v. State, 1988 OK CR 271, ¶¶ 6-8, 765 P.2d 1215, 1218-19 (improper opinion regarding hair-comparison evidence).

Appellant's claims that the jury "no doubt" assumed that a luminol reaction conclusively indicated the presence of human blood, and that Perkins' testimony was "devastating" to the defense, are simply not supported by the record. Perkins made it explicitly clear that he could not say with certainty whether the areas which reacted to luminol actually contained the victims' blood, or any blood for that matter. He was cross-examined thoroughly on the limitations of luminol testing. Appellant's own expert also testified about luminol's strengths and weaknesses. See Harris v. State, 2000 OK CR 20, ¶¶ 27-28, 13 P.3d 489, 496-497, cert. denied, 532 U.S. 1025, 121 S.Ct. 1971, 149 L.Ed.2d 764 (2001). The luminol results were relevant, as they suggested that the perpetrator may have washed something covered with the victims' blood in the victims' bathroom sink. This inference could be corroborated by other undeniable facts: that the fatal injuries created a large amount of blood, that no weapon was left at the scene, and that a hand towel, belonging to the victims and found in the apartment dumpster after the murders, was also stained with blood. An inference that the perpetrator may have cleaned himself and/or the murder weapon before leaving the scene was not difficult to reach, nor was it even arguably "devastating" to the defense, which focused on the claim that Appellant simply was not the perpetrator, and which emphasized that no traces of blood were found on Appellant, his effects, or the knife he had borrowed from Al Ames.

As for Perkins' and Bevel's opinions that the blood swipe on Sloniker's foot was "consistent" with Ames' hunting knife, and "could have" been made by that knife: there is no indication that these opinions were based on any particular specialized knowledge, and any comparison between the dimensions of the suspected murder weapon and the blood swipe was one the jurors could make without expert assistance. See Wacoche v. State, 1982 OK CR 55, ¶ 22,

644 P.2d 568, 573 (experts should not testify about matters which the jurors can determine for themselves). Yet, trial counsel did not lodge a contemporaneous objection to this testimony, thereby waiving all but plain error. McCarty v. State, 1998 OK CR 61, ¶ 60, 977 P.2d 1116, 1132. We fail to see how Appellant was prejudiced by this testimony. Both experts made it clear that they could not "match" any particular knife to the blood swipe, although they felt confident that the knives in Appellant's own collection were too narrow to have made the mark. Defense counsel chose to highlight that fact in cross-examination. The prosecutors' comments at various points during trial that Ames's knife matched the swipe (or words to that effect) were at times overstated, but the jury was instructed that these comments were not evidence; and as noted, the limitations of the evidence itself were apparent from the expert testimony. In fact, in final closing, the prosecutor invited the jurors to handle the physical evidence during deliberations and determine the issue for themselves.

Error occurs when the State offers scientific conclusions that cannot reasonably be drawn from the procedure used. No such error occurred here. The State's forensic experts' findings were relevant to the manner in which the victims were killed. The limitations of their methodologies, and the resulting qualifications on their conclusions, were thoroughly explored in cross-examination and through the presentation of defense expert testimony. The jury was not misled, either by testimony or argument, as to the inferences which could be drawn from this evidence. Proposition 4 is denied.

Dodd, 100 P.3d at 1036-38.

Petitioner's claims are properly characterized as a due process challenge to the State evidentiary rulings. On habeas review, this Court may not disturb the State court's evidentiary rulings unless Petitioner demonstrates that the admission was error, and that the error was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." Williamson v. Ward, 110 F.3d 1508, 1522 (10th Cir. 1997); See Estelle v McGuire, 502 U.S.62, 67-68 (1991); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

As the OCCA explained, it has long considered Luminol testing, as a scientific procedure, sufficiently reliable to presumptively indicate the possible presence of blood. The "blood swipe" testimony was opinion testimony not requiring expert assistance and, therefore, did not require a hearing to determine if it was "scientifically unreliable" as Petitioner alleges. Whether or not the admission of evidence and testimony were erroneous, however, Petitioner has not demonstrated the admission of the evidence so infected the trial as to deny him due process. As recognized by the OCCA, both experts and their respective opinions were subjected to thorough cross-examination. Both experts testified the blood swipe "could have" been made by the Ames knife and it was apparent from both testimony and cross-examination that the Luminol was only a presumptive test and could not conclusively indicate the presence of blood. Petitioner's own expert testified about the strengths and weakness of Luminol testing. Importantly, the testimony regarding the blood swipe and the Luminol testing pertained to the investigation of the crime scene only. No blood was found on the Ames knife and no conclusive evidence of blood belonging to Petitioner was found at the scene. As the OCCA adeptly pointed out, the challenged evidence was not devastating to the Petitioner as his defense focused on the claim that he was not the perpetrator. Any inferences possibly drawn by the jury from the evidence and testimony were also applicable to someone else committing the murders.

Petitioner has failed to demonstrate that the admission of the evidence and testimony was erroneous under Daubert. He has also failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law as

determined by the Supreme Court. 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner's twelfth ground for relief is denied.

<u>Ground 13:</u>   <u>Trial Court Errors.</u>

In his thirteenth ground for relief, Petitioner re-alleges various errors asserted elsewhere throughout his Petition and then adds additional claims of "trial court errors" in argument that he was denied a fair trial: the trial court "1) allowed the instances described as prosecutorial misconduct in Ground Six[42], 2) permitted the introduction of suicide evidence, 3) mishandled the jury note as described in Grounds Four and Six, and 4) denied a jury view of the crime scene that could have helped clarify the issue ultimately raised by the jury note." (Pet. at 139-40.)  He concludes that the OCCA's resolution of the claim does not adequately address such concerns and is both unreasonable and contrary to law. Respondent responds that this specific claim of trial court error for failing to stop alleged errors during the trial is unexhausted.  Alternatively, he argues habeas relief is unwarranted as Petitioner was not deprived of a fundamentally fair trial.

Petitioner's ground for relief presents a somewhat contorted and disorienting line of reasoning.  First, he claims he is entitled to habeas relief because the trial court erred by allowing "errors" such as prosecutorial misconduct, improper admission of evidence, mishandling of a note to the jury, and failing to allow the jury to visit the crime scene. When, however, Respondent asserts that this claim of "trial court error" is unexhausted,

_____

[42] Petitioner admits it is Ground 5 of his Petition in connection with this proposition. (Reply at 97, n. 39.)

Petitioner replies that the claim is exhausted as demonstrated by the OCCA's determination of the individual claimed errors and refers the Court to a specific ground for relief in his Petition. (Reply at 98.)

Whether or not this claim is exhausted, the Court may deny it on the merits. 28 U.S.C. § 2254(b)(2). The errors Petitioner alleges were allowed by the trial court to exist and continue throughout his trial have been addressed elsewhere throughout this Opinion. None were found to be error, or if error, were determined to be harmless. Without the underlying errors that serve as the basis for his claim, the trial court cannot be found to have contributed to an unfair proceeding and an unreliable result.[43]   Accordingly, Petitioner's thirteenth ground for relief is denied.

Ground 14:    Ineffective Assistance of Appellate Counsel.

Petitioner claims prior counsel failed to raise or adequately preserve the issues presented in his Petition and, as such, provided ineffective representation requiring habeas relief. (Pet. at 140-41.) Respondent responds that the underlying claims have already been considered or have been determined to be procedurally barred, and that appellate counsel were constitutionally effective in their handling of Petitioner's case. (Resp. at 201.)

A claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, although it is difficult to show deficient performance under those circumstances because counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. at 288, 120 S.Ct.

---

[43] If, however, Petitioner's claim here is a camouflaged cumulative error argument, the Court will address that argument in response to Petitioner's fifteenth ground for relief.

746 (following <u>Jones v. Barnes</u>, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). Thus, in analyzing an appellate ineffectiveness claim based upon the failure to raise an issue on appeal, "we look to the merits of the omitted issue," <u>Neill v. Gibson</u>, 278 F.3d 1044, 1057 (10th Cir.2001) (quotation omitted), <u>cert. denied</u>, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002), generally in relation to the other arguments counsel did pursue. If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance. <u>See, e.g.</u>, <u>Smith</u>, 528 U.S. at 288, 120 S.Ct. 746; <u>Banks v. Reynolds</u>, 54 F.3d 1508, 1515-16 (10th Cir. 1995); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d Cir. 1994).

<u>Cargle v. Mullin</u>, 317 F.3d 1196, 1202-03 (10th Cir. 2003) (footnote omitted).

Petitioner incorporates by reference those issues "delineated in some detail" in the individual grounds for relief, and particularly contends appellate counsel was ineffective with respect to presentation and preservation of the following issues: 1) trial counsel's failure to adequately argue the alternate suspects defense and to cross-examine witnesses about the question of foreign voices allegedly heard outside the apartment; 2) trial counsel's poor, inadequate, and ill-considered advice concerning Petitioner's testimony; 3) the prosecutor's misleading window argument and the jury note related to that issue; 4) the prosecutor's statements capitalizing on exclusion of defense evidence; 5) trial counsel's failures in mitigation and exploitation by the prosecutor's normal childhood argument; and, 6) judicial bias. Petitioner contends these issues were meritorious and more important than others that were raised by appellate counsel. Contrary to Petitioner's contentions, however, none of

these claims are plainly meritorious and are, therefore, insufficient to establish deficient performance by appellate counsel.

As discussed elsewhere in this Opinion, the trial court properly ruled that trial counsel failed to satisfy Oklahoma's overt act rule. Appellate counsel was not ineffective for failing to argue trial counsel ineffectiveness for failing to adequately argue the alternate suspects defense. Questioning witnesses about foreign voices allegedly heard outside the apartment would have violated the trial court's ruling. Further, such testimony, together with the tenuous connection to an Asian gang, would still be insufficient evidence of acts or circumstances that would tend to clearly point to another, rather than Petitioner, as required by Oklahoma law.

The claim of poor advice by trial counsel regarding Petitioner's testimony is also without merit as Petitioner cannot demonstrate deficient performance of either trial or appellate counsel. This is not an instance where discussion and counseling regarding whether or not to testify was totally absent. Trial counsel did discuss and advise Petitioner regarding testifying prior to trial. Petitioner's direct testimony was clearly designed to rebut the State's case. It was further an opportunity for Petitioner to express and demonstrate his innocence – an opportunity Petitioner clearly desired.[44] Petitioner may be unsatisfied with the outcome of his cross-examination testimony, but dissatisfaction is insufficient to demonstrate ineffective assistance of trial counsel. As Petitioner has not overcome the strong

---

[44] When asked why he was testifying about the events surrounding the murders, Petitioner responded "Because I'm under oath and because only the truth can save me." He next responded he did not kill Shane McInturff or Keri Sloniker, nor did he know who did. (Tr., Vol. XIV, p. 85.)

presumption that the decision to testify was a strategic choice, he cannot, therefore, demonstrate appellate counsel's omission of this claim amounted to deficient performance.

Petitioner's appellate counsel ineffectiveness claims regarding the prosecutor's "misleading" window argument, comments allegedly capitalizing on exclusion of defense evidence, and judicial bias are also without merit. The underlying substance of these claims was raised on direct appeal and the OCCA's determination denying relief has been found elsewhere in this Opinion to be reasonable. As the underlying issues are meritless, appellate counsel's omission of an ineffective assistance of trial counsel claim with respect to these issues does not amount to deficient performance.[45]

Lastly, Petitioner claims appellate counsel was ineffective in presentation and preservation of trial counsel's failures in mitigation evidence and failure to curb exploitation by the prosecutor through his "normal childhood" argument. These ineffective assistance of trial counsel claims were found to be procedurally barred from review. (See Ground 4.) The crux of the claims, however, was that trial counsel did not present evidence of Petitioner's abusive and turbulent childhood and that the prosecutor, knowing of Petitioner's childhood experiences, was nevertheless allowed to argue that Petitioner had a normal childhood. As discussed above, and in this Opinion regarding Petitioner's claims of ineffective assistance of trial counsel, there is a strong presumption that "counsel's conduct fell within the 'wide range of reasonable professional assistance' that 'might be considered

---

[45] As to the underlying claim of judicial bias, the OCCA determined on Petitioner's second application for post-conviction relief that no ineffective assistance of appellate counsel existed. Dodd, No. PCD-2002-625, slip op. at 3-6.

sound trial strategy.'" <u>Strickland</u>, 466 U.S. at 689 (citation omitted).

Although Petitioner refers to instances of his abusive childhood admitted in his first trial to support his claim, he does not offer argument to persuasively demonstrate that the decision to omit such evidence in his second trial was not the result of a strategic decision. Trial counsel here did not fail to present mitigation evidence. Evidence of Petitioner's good qualities and relationships were presented, apparently designed to show the absence of future dangerousness. Petitioner has not demonstrated that the avoidance of evidence of his abusive childhood – evidence previously presented in his first trial that resulted in a sentence of death – was an unreasonable strategy. In light of the results in his first trial, a decision to take a different tack the second time around cannot be considered unreasonable. Further, it did not amount to deficient performance for trial counsel to fail to object to the prosecutor's characterization of Petitioner's background as a normal childhood. The comments were based on the evidence presented during the second stage of trial. To object to such comments could have confused the jury and potentially allowed them to unfavorably speculate on the purpose of the objection. Moreover, it is not entirely clear from the prosecutor's argument that he was referring to Petitioner as having had a normal childhood. It is apparent to the Court that the argument is easily susceptible to different interpretations. (<u>See</u> Tr., Vol. XVIII, pp. 11-38.)

Assessing the above issues relative to the rest of the appeal, and affording appellate counsel the deferential consideration that must be given to any professional judgment involved, the Court finds that Petitioner has not demonstrated appellate counsel was

115

objectively unreasonable in failing to raise or preserve these claims, or that there was a reasonable probability that, but for such failure, Petitioner would have prevailed on his appeal. See Neill v. Gibson, 278 F.3d 1044, 1057 (10th Cir. 2001). Accordingly, Petitioner's fourteenth ground for relief is denied.

Ground 15:    Cumulative Impact of Errors.

In his fifteenth ground for relief, Petitioner claims that in the event that any individual error in his case is deemed insufficient to warrant relief, the accumulation of errors in his case so infected the trial and sentencing proceedings with unfairness that he was denied due process of law and a reliable sentencing proceeding in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. (Pet. at 141-43.)  The OCCA considered this claim on direct appeal.  It noted that it found certain bad acts evidence was improperly admitted and certain conduct of the prosecutors less than exemplary at times.   Despite those errors, however, it found each to have not prejudiced Petitioner's substantive rights.  The State court went on to hold that "while certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial or a reliable sentencing proceeding. Chapman, 386 U.S. at 24, 87 S.Ct. at 828." Dodd, 100 P.3d at 1051.

It is true as a general principle of law that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." United States v. Oberle, 136 F.3d 1414, 1423 (10th Cir. 1998) (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990)).  However, "'[a] cumulative-error analysis merely aggregates all the errors that individually have been found

to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.' The analysis, however, 'should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.'" Id. (quoting Rivera, 900 F.2d at 1470-71). See also Newsted v. Gibson, 158 F.3d 1085, 1097 (10th Cir. 1998); Castro v. Ward, 138 F.3d 810, 832-33 (10th Cir. 1998); United States v. Trujillo, 136 F.3d 1388, 1398 (10th Cir. 1998).

Upon review of the entire trial transcript and the evidence and testimony presented, the Court does not find that the accumulation of those errors determined to be harmless had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Each of the errors identified here and by the OCCA had minor significance. See Alvarez v. Boyd, 225 F.3d 820, 825 (7th Cir. 2000) (courts must be careful not to magnify the significance of errors which had little importance in the trial setting). As expressed by the OCCA, the errors it found were not so egregious or numerous as to prejudice Petitioner to the same extent as a single reversible error. The addition of the errors found here into the Court's consideration of this claim does not alter that determination. Although this was a circumstantial evidence case, the cumulative effect of the errors, when compared with the evidence and testimony presented at trial, did not significantly strengthen the State's case or diminish Petitioner's case. No reasonable probability exists that the jury would have acquitted Petitioner absent the errors. Additionally, the cumulative effect of the errors was insufficient to undermine the

aggravating circumstances found by the jury. Accordingly, Petitioner's fifteenth ground for relief is denied.

## V. CONCLUSION.

After a complete review of the transcripts, trial record, appellate record, record on post-conviction proceedings, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds Petitioner's request for relief in his *Petition For Writ of Habeas Corpus* (Dkt. No. 21) should be denied. ACCORDINGLY, habeas relief is DENIED on all grounds. An appropriate judgment will be entered.

IT IS SO ORDERED this 2nd day of August, 2011.

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE